Mistee L. Elliott
Madeleine J. Lewis
CROWLEY FLECK
101 West Brundage Street
Sheridan, WY 82801
(307) 673-3000 / Fax: (307) 672-1732
melliott@crowleyfleck.com
mlewis@crowleyfleck.com

Brian A. Glasser (*pro hac vice forthcoming*)
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street NW Suite 540
Washington, DC 20007
(202) 463-2101 / Fax: (202) 463-2103
bglasser@baileyglasser.com

Ben A. Schwartzman (*pro hac vice forthcoming*)
BAILEY & GLASSER, LLP
950 West Bannock Street, Suite 940
Boise, ID 83702
(208) 342-4411 / Fax: (208) 342-4455
bschwartzman@baileyglasser.com

*Attorneys for Plaintiff*

**FILED**

**1:22 pm, 5/6/22**

**Margaret Botkins
Clerk of Court**

# UNITED STATED DISTRICT COURT
# DISTRICT OF WYOMING

| | | |
|---|---|---|
| **WILDCAT COAL LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **COMPLAINT**   22-CV-102-F |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PACIFIC MINERALS, INC.** and | ) | |
| **IDAHO ENERGY RESOURCES CO.** | ) | |
| doing business together | ) | |
| as a joint venture under the trade name | ) | |
| **BRIDGER COAL COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

WILDCAT COAL LLC ("**Wildcat Coal**" or "**Plaintiff**") files this Complaint against

PACIFIC MINERALS, INC. and IDAHO ENERGY RESOURCES CO., doing business together

as a joint venture under the trade name BRIDGER COAL COMPANY (together referred to herein as "**Defendant**" or "**Bridger Coal**").   Plaintiff alleges as follows for its Complaint against Defendant:

**NATURE OF ACTION AND RELIEF SOUGHT**

1.     This case arises from Bridger Coal's breach of a coal mining lease known as the "Nine Mile Draw Area Lease" under which Wildcat Coal leases coal properties situated in Sweetwater County, Wyoming to Bridger Coal.

2.     The Nine Mile Draw Area Lease requires Bridger Coal to conduct its mining operations to extract from the lease premises during each five-year period of the term not less than forty-five percent (45%) of the total quantity of coal mined by Bridger Coal from the lease premises together with certain other "Adjoining Lands" also leased by Bridger Coal.

3.     Bridger Coal's obligation during each five-year period to mine from the lease premises at least forty-five percent (45%) of its total coal production from the lease premises and the Adjoining Lands combined is referred to herein as the "**Forty-Five Percent Production Threshold**."

4.     An advance royalty payment provision contained in the Nine Mile Draw Area Lease serves as a remedy for Wildcat Coal in the event Bridger Coal fails to satisfy the Forty-Five Percent Production Threshold during any five-year period.

5.     Under the advance royalty payment provision, the lessee shall pay the lessor advance royalties commencing on January 1, 1991 and on each fifth anniversary date thereafter throughout the lease term equal to (a) the amount of production royalties which would have been payable to the lessor under the lease during the preceding five-year period if the lessee had satisfied

the Forty-Five Percent Production Threshold, less (b) the production royalties and advance royalties actually paid to the lessor by the lessee during such period.

6.      Bridger Coal paid Wildcat Coal an advance royalty payment in the amount of $2,923,309.80 based on its failure to satisfy the Forty-Five Percent Production Threshold during the five-year period from January 2016 through December 2020.   However, Bridger Coal miscalculated the advance royalty payment, depriving Wildcat Coal of millions of dollars, and subsequently disavowed its obligation to make the advance royalty payment altogether.

7.      One year after making the advance royalty payment that is intended to be Wildcat Coal's sole remedy under the lease for Bridger Coal's failure to satisfy the Forty-Five Percent Production Threshold during any five-year period, Bridger Coal notified Wildcat Coal that based on a newly adopted and strained interpretation of the advance royalty payment provision, it was entitled to take a credit in the amount of any coal production from the lease premises in excess of the Forty-Five Percent Production Threshold during any prior five-year periods of the lease against its production shortfall during the five-year period from January 2016 through December 2020. Bridger Coal's new lease interpretation zeroed out the prior advance royalty payment to Wildcat Coal and left an "excess production" credit to apply toward any production shortfalls in future five-year lease periods.

8.      Based on its new lease interpretation, Bridger Coal is now withholding all actual production royalty payments due to Wildcat Coal under the lease in order to improperly recoup the $2,923,309.80 advance royalty payment it made to Wildcat Coal.

9.      Bridger Coal breached the advance royalty payment provision of the Nine Mile Draw Area Lease by: (i) miscalculating the percentage of its total production mined from the lease premises and from the Adjoining Lands for the five-year period from January 2016 through

December 2020; (ii) improperly giving itself a credit in the amount of tons produced from the lease premises in excess of the Forty-Five Percent Production Threshold during prior five-year periods of the lease term against its shortfall in the Forty-Five Percent Production Threshold during the five-year period from January 2016 through December 2020, thereby zeroing out its earlier advance royalty payment to Wildcat Coal; and (iii) improperly withholding production royalties due to Wildcat Coal to recoup its earlier advance royalty payment based on a faulty lease interpretation.

10.     Wildcat Coal seeks an award of money damages against Bridger Coal to recover its losses caused by Bridger Coal's improper calculation of advance royalties payable to Wildcat Coal under the Nine Mile Draw Area Lease, as well as to recover production royalty payments improperly withheld by Bridger Coal.

11.     Wildcat Coal also seeks the entry of an order specifically enforcing Bridger Coal's obligation to pay the advance royalty payment due for the five-year period from January 2016 through December 2020, as well the advance royalty payments with respect to any future five-year period of the lease, as they are required to be calculated under the plain language of the Nine Mile Draw Area Lease.

## **PARTIES**

12.     Plaintiff Wildcat Coal is a Delaware limited liability company having its principal office at 250 W. Main Street, Suite 2000, Lexington, Kentucky 40507, and having no members which are citizens of the State of Wyoming.

13.     Defendant Pacific Minerals, Inc. is a Wyoming corporation having its principal office at 1407 West North Temple, Salt Lake City, Utah 84116.

14.     Defendant Idaho Energy Resources Co., is a Wyoming corporation having its principal office at 1221 W. Idaho Street, Boise, Idaho 83702.

15.     At all times relevant to this Complaint, Defendants Pacific Minerals, Inc. and Idaho Energy Resources Co. have operated a joint venture under the trade name Bridger Coal Company.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as this is an action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because all defendants in this action are Wyoming corporations and the State of Wyoming has a single federal judicial district.

## FACTS

18.     On January 1, 1986, Plaintiff Wildcat Coal's predecessor-in-interest, Rock Springs Royalty Company, entered into a coal mining lease entitled "Mining Lease of Coal Lands, Nine Mile Draw Area" with Defendants Pacific Minerals, Inc. and Idaho Energy Resources Co. doing business as a joint venture under the trade name Bridger Coal Company, a true and correct copy of which is attached hereto as Exhibit A (the "**Nine Mile Draw Area Lease**" or the "**Lease**").

19.     Certain provisions of the Nine Mile Draw Area Lease were amended by an Amendment to Agreements dated September 3, 2009 but effective as of June 1, 2009, a true and correct copy of which is attached hereto as Exhibit B (the "**Lease Amendment**").

20.     The initial term of the Nine Mile Draw Area Lease commenced on January 1, 1986 and continued thereafter until July 1, 2019. *See* Exhibit A, Section 3.

21.     By letter dated December 20, 2018 from Bridger Coal to Anadarko Petroleum Corporation, a predecessor-in-interest to Wildcat Coal under the Nine Mile Draw Area Lease, Bridger Coal exercised its right to extend the term of the Lease for an additional twenty-five year period after expiration of the initial term. *See* Letter dated December 20, 2018 from Defendant Pacific Minerals, Inc. on behalf of Bridger Coal Company and its joint venture partners to Anadarko Petroleum Corporation, a predecessor-in-interest to Plaintiff Wildcat Coal under the Nine Mile Draw Area Lease, a true and correct copy of which is attached hereto as Exhibit C (the "**Lease Extension Letter**").

22.     Thus, the Nine Mile Draw Area Lease is currently in effect and will remain in effect until July 1, 2044, subject to the termination provisions set forth in the Lease. *See* Exhibit A, Sections 3 and 12, and Exhibit C.

23.     Wildcat Coal, as the lessor under the Nine Mile Draw Area Lease, leases to Bridger Coal, as the lessee, certain coal properties situated in Sweetwater County, Wyoming described in the Lease and referred to therein as the "**Rock Springs Lands**" or the "**Leased Premises**". *See* Exhibit A, Recital 3 and Section 1.

24.     At the time the Nine Mile Draw Area Lease was executed, Bridger Coal owned, and continues to own, other coal leases and prospecting permits from the United States and the State of Wyoming in the vicinity of the Rock Springs Lands which are identified on Exhibit A of the Lease. *See* Exhibit A at Recital 3 and Exhibit "A".

25.     The other Bridger Coal leases and permits identified on Exhibit "A" of the Nine Mile Draw Area Lease, together with "any contiguous leases or permits acquired hereafter" by Bridger Coal, "and the land covered thereby", are defined in the Lease as the "**Adjoining Lands**". *See* Exhibit A at Recital 3.

26.     At all times relevant to this Complaint, the Adjoining Lands have included the following areas leased from Wildcat Coal to Bridger Coal:  (a) the premises of that Coal Lease Agreement dated January 4, 2012 between Anadarko Land Corp., Lessor and Bridger Coal, Lessee, as amended from time to time (the "**Section 11 Lease**"); (b) the premises of that Coal Lease Agreement dated April 21, 2014 between Anadarko Land Corp., Lessor and Bridger Coal, Lessee, as amended from time to time (the "**Section 25 Lease**"); and (c)  the premises of that Lease Agreement dated December 22, 2003 between Anadarko Land Corp., Lessor and Bridger Coal, Lessee, as amended from time to time (the "**Ten Mile Rim Lease**").

27.     At all times relevant to this Complaint, the Adjoining Lands have included the following areas leased to Bridger Coal by the U.S. Department of the Interior, Bureau of Land Management ("**BLM**") and the State of Wyoming:  (a) BLM lease at Township 22 North, Range 101 West, Section 26; (b) BLM lease at Township 22 North, Range 101 West, Section 34; (c) BLM lease at Township 21 North, Range 101 West, Section 2; (d) BLM lease at Township 21 North, Range 100 West, Section 6; (e) BLM Lease at Township 21 North, Range 101 West, Section 12; (f) State of Wyoming lease at Township 22 North, Range 101 West, Section 36; and (g) State of Wyoming lease at Township 20 North, Range 100 West, Section 36.  All of the BLM lease areas identified in the preceding sentence are referred to collectively herein as the "**BLM Adjoining Lands**", and all of the State of Wyoming lease areas identified in the preceding sentence are referred to collectively herein as the "**State of Wyoming Adjoining Lands**".

28.     During each five-year period of the Nine Mile Draw Area Lease term, Bridger Coal is obligated to satisfy the Forty-Five Percent Production Threshold.

29.     The Forty-Five Percent Production Threshold is set forth in Section 5 of the Lease, entitled "Production Obligations of Lessee", which section states in its entirety:

Consistent with good engineering practices, Lessee shall conduct mining operations so as to extract from Rock Springs Lands over each five-year period of the term of this Lease commencing January 1, 1986, approximately not less than forty-five percent (45%) of the total quantity of coal mined from Rock Springs Lands and Adjoining Lands. Subject to the foregoing, Lessee may determine, in its own discretion, the sequence of extracting coal from Rock Springs Lands and Adjoining Lands. Any failure by Lessee to take agreed-upon quantities of coal from Rock Springs Lands prior to January 1, 1986 is forgiven and Lessor waives any claims it may have in regard to such failure.

*See* Exhibit A, Section 5.

30.     The Nine Mile Draw Area Lease requires Bridger Coal to pay an advance royalty to Wildcat Coal for each five-year period of the term, the calculation of which is based on Bridger Coal's degree of compliance with the Forty-Five Percent Production Threshold during such five-year period.

31.     Section 6.A. of the Lease, entitled "Royalty and Other Payments", states in its entirety:

On January 1, 1991, and on each fifth anniversary date throughout the term of this Lease, Lessee shall pay to Lessor, advance royalties, if any, equal to (i) the amount of Production Royalties computed according to Paragraph B of this Section 6 which would have been payable to Lessor to date under this Agreement had Lessor received Production Royalties on forty-five percent (45%) of all coal mined by Lessor from Rock Springs Lands and Adjoining Lands during such period, less (ii) the Production Royalties and advance royalties actually paid to Lessor by Lessee during such period. Such advance royalty payments shall be Lessor's sole remedy for Lessee's failure to comply with the provisions of Section 5.

*See* Exhibit A, Section 6.A.

32.     Pursuant to the Lease Amendment, Bridger Coal is required to pay Wildcat Coal a production royalty calculated on a per-ton basis, for each Sale of coal extracted from the Leased Premises, in the amount of (a) Twelve and One-Half Percent (12.5%) of the Sale Price in the case of an Arm's Length Transaction, and (b) Three and 05/100 Dollars ($3.05) per ton of coal in the case of an Intracompany Transfer or a Non-Arm's Length Transaction, all as defined in the Lease

8

Amendment and subject to certain royalty rate adjustments specified therein (the "**Production Royalty**"). *See* Exhibit B, Paragraph 1 (deleting and replacing Section 6.B. of the Nine Mile Draw Area Lease in its entirety).

33.     Under Section 6.B (i) of the Nine Mile Draw Area Lease, as amended, Bridger Coal is required to pay the Production Royalty each month for the period of production of the preceding calendar month. *See* Exhibit B, Paragraph 1.

34.     On December 30, 2020, Bridger Coal advised Wildcat Coal that production from the Rock Springs Lands might result in a shortfall from the Forty-Five Percent Production Threshold set forth in Section 5 of the Lease for the five-year period from January 1, 2016 through December 31, 2020.

35.     Following a review of its production numbers after the conclusion of calendar year 2020, on January 13, 2021 Bridger Coal made an advance royalty payment to Wildcat Coal in the amount of $2,923,309.80, based on an 846,600 ton shortfall from the Forty-Five Percent Production Threshold during the period from January 1, 2016 through December 31, 2020 (hereinafter, the "**Advance Royalty Payment**").

36.     On information and belief, the Advance Royalty Payment made by Bridger Coal to Wildcat Coal on January 13, 2021 was the first payment of advance royalties made to the Lessor by the Lessee since the inception of the Lease.

37.     In calculating the Advance Royalty Payment, Bridger Coal improperly computed its percentage of coal production from the Nine Mile Draw Area Lease by counting its coal production from two Adjoining Lands – the Section 11 Lease and the Section 25 Lease – as production from the Rock Springs Lands for the period from January 2016 through December 2020, instead of counting production from these other leases as production from Adjoining Lands.

38.     In calculating the Advance Royalty Payment, Bridger Coal improperly computed the Forty-Five Percent Production Threshold by failing to include its production from the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands as production from Adjoining Lands.

39.     On June 29, 2021, Wildcat Coal advised Bridger Coal that it objected to Bridger Coal's calculation of the Advance Royalty Payment and requested production data from all of the Adjoining Lands. *See* letter from Chad Salyer to Jeff Potter dated June 29, 2021, a true and correct copy of which is attached hereto as Exhibit D.

40.     Based on production data Bridger Coal provided to Wildcat Coal, the advance royalties owed for the period from 2016 through 2020 total $22,072,656.79 when Bridger Coal's production from the Section 11 Lease, the Section 25 Lease, the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands are included as production from Adjoining Lands in calculating the Forty-Five Percent Production Threshold for such period.

41.     By letter dated January 13, 2022, Bridger Coal's counsel advised Wildcat Coal that, based on a newly adopted interpretation of Sections 5 and 6 of the Lease, Bridger Coal did not actually owe the Advance Royalty Payment to Wildcat Coal in any amount, notwithstanding the fact that Bridger Coal did not satisfy the Forty-Five Percent Production Threshold for the period from 2016 through 2020. *See* Letter dated January 13, 2022 from Richard R. Hall to Chad Salyer, a true and correct copy of which is attached hereto as Exhibit E.

42.     Bridger Coal now maintains that in calculating advance royalties due to Wildcat Coal under Section 6, its degree of compliance with the Forty-Five Percent Production Threshold is not judged solely by its production history on the Rock Springs Lands and the Adjoining Lands over the five-year period with respect to which the advance royalty is to be calculated, but rather,

is judged by its production history over the entire term of the Nine Mile Draw Area Lease. *See* Exhibit E.

43.     Bridger Coal now maintains that when calculating advance royalties due to Wildcat Coal under Section 6, it is permitted to take into account its production history over the entirety of the Lease term, with the result that any production in excess of the Forty-Five Percent Production Threshold during any prior five-year period during the term will yield a production royalty credit to be applied against any failure to satisfy the Forty-Five Percent Production Threshold in any later five-year period. *See* Exhibit E.

44.     Based on its new lease interpretation, Bridger Coal advised Wildcat Coal that due to coal production in excess of the Forty-Five Percent Production Threshold in earlier years of the lease, as of December 31, 2020, Bridger Coal had accrued a royalty offset credit of approximately 10.5 million tons, which should have been applied against its 2016-2020 coal production shortfall, with the remaining credit applying to any future production shortfall. *See* Exhibit E.

45.     Bridger Coal further advised that, based upon its new lease interpretation, it owed no advance royalties to Wildcat Coal for the 2016 through 2020 period, and commencing with the Production Royalty payment due on January 31, 2022, Bridger Coal would begin withholding all Production Royalty payments due to Wildcat Coal under the Nine Mile Draw Area Lease until it has recouped the Advance Royalty Payment in full. *See* Exhibit E.

46.     Bridger Coal has withheld all Production Royalty payments due to Wildcat Coal under the Nine Mile Draw Area Lease since its January 13, 2022 letter, over Wildcat Coal's objection.

47.     On March 4, 2022, Wildcat Coal served Bridger Coal with a notice of breach of lease and demand for cure of the breach within sixty (60) days pursuant to Section 13.A. of the

Nine Mile Draw Area Lease, a true and correct copy of which is attached hereto as Exhibit F (the "**Notice of Breach**").

48.     The Notice of Breach advised Bridger Coal that Wildcat Coal has sustained lost advance royalties in the amount of $19,149,346.99 due to Bridger Coal's failure to include its production from the Section 11 Lease, the Section 25 Lease, the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands as production from Adjoining Lands when determining the Forty-Five Percent Production Threshold for the period from 2016 through 2020 for purposes of calculating the advance royalty payment due to Wildcat Coal on January 1, 2021.  *See* Exhibit F.

49.     The Notice of Breach further advised Bridger Coal that Wildcat Coal sustained lost Production Royalties in the amount of $1,209,854.45 due to Bridger Coal's wrongful withholding of all Production Royalty payments due in order to recoup the Advance Royalty Payment Bridger Coal now denies it was required to make, with such lost Production Royalties increasing each month as Bridger Coal continues to wrongfully withhold Production Royalty payments.  *See* Exhibit F.

50.     Bridger Coal refuses to acknowledge or to cure its breaches of the Nine Mile Draw Area Lease, and continues to wrongfully withhold all Production Royalties owed to Wildcat Coal. *See* Letter dated May 2, 2022 from Richard R. Hall to Brian A. Glasser, a true and correct copy of which is attached hereto as Exhibit G.

## COUNT I
## BREACH OF NINE MILE LEASE

### MONEY DAMAGES

51.     Wildcat Coal repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

52.     Pursuant to Section 5 of the Nine Mile Draw Area Lease, Bridger Coal is required to conduct its mining operations so as to extract from the Rock Springs Lands over each five-year period of the term not less than forty-five percent (45%) of the total quantity of coal mined from the Rock Springs Lands and the Adjoining Lands combined. Exhibit A, Section 5.

53.     Pursuant to Section 6 of the Nine Mile Draw Area Lease, Bridger Coal is required to pay Wildcat Coal advance royalties for each five-year period of the term in an amount equal to (a) the amount of Production Royalties which would have been payable to Wildcat Coal during the preceding five-year period if Bridger Coal had satisfied the Forty-Five Percent Production Threshold, less (b) the Production Royalties and advance royalties actually paid to Wildcat Coal by Bridger Coal during such period. Exhibit A, Section 6.

54.     The advance royalties assessed under Section 6 of the Lease are intended to serve as Wildcat Coal's sole remedy for Bridger Coal's failure to satisfy the Forty-Five Percent Production Threshold in Section 5 of the Lease during any five-year period, without reference to any production by Bridger Coal from the Rock Springs Lands in excess of the Forty-Five Percent Production Threshold during any prior five-year periods of the term. *See* Exhibit A, Sections 5 and 6.

55.     At all times relevant to this Complaint, the Adjoining Lands have included the Section 11 Lease, the Section 25 Lease, the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands.

56.     Bridger Coal's calculation of the Advance Royalty Payment constitutes a breach of the Nine Mile Draw Area Lease, inasmuch as Bridger Coal counted its coal production from the Section 11 Lease and the Section 25 Lease during the period from January 2016 through December

2020 as coal produced from the Rock Springs Lands, instead of counting coal mined from the Section 11 Lease and the Section 25 Lease as production from Adjoining Lands.

57.     Bridger Coal's calculation of the Advance Royalty Payment constitutes a breach of the Nine Mile Draw Area Lease inasmuch as Bridger Coal did not include its coal mined from the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands during the period from January 2016 through December 2020 as coal produced from Adjoining Lands when determining the Forty-Five Percent Production Threshold.

58.     Bridger Coal further breached the Nine Mile Draw Area Lease by giving itself a credit for any production in excess of the Forty-Five Percent Production Threshold during all prior five-year periods to apply against its shortfall in the Forty-Five Percent Production Threshold for the five-year period from January 2016 through December 2020 and for future five-year periods of the Lease term.

59.     Bridger Coal's withholding of all future Production Royalty payments owed to Wildcat Coal until such time as it has fully recouped the Advance Royalty Payment is a breach of the Nine Mile Draw Area Lease.

60.     As a direct and proximate result of Bridger Coal's breach of the Lease, Wildcat Coal has suffered money damages in the form of lost advance royalty payments and improperly withheld Production Royalty payments.

61.     Wildcat Coal's money damages resulting from Bridger Coal's improper calculation of the Advance Royalty Payment by (a) counting its coal mined from the Section 11 Lease and the Section 25 Lease toward its production from the Rock Springs Lands, and (b) omitting its production from the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming

Adjoining Lands in determining the Forty-Five Percent Production Threshold for the period from January 2016 through December 2020, total $19,149,346.99.

62.    As of the date of this Complaint, Wildcat Coal's money damages resulting from Bridger Coal's wrongful withholding of Production Royalty payments to recoup the Advance Royalty Payment it now claims was not due in any amount total $1,209,854.45.

63.    Wildcat Coal's money damages will continue to accrue as long as Bridger Coal continues to withhold Production Royalties payable to Wildcat Coal until it has fully recouped the Advance Royalty Payment, and such money damages shall further accrue as long as Bridger Coal takes a credit in the amount of any production in excess of the Forty-Five Percent Production Threshold during prior five-year periods against any shortfall in the Forty-Five Percent Production Threshold during future five-year periods of the Lease term.

## COUNT II
## BREACH OF NINE MILE LEASE

## SPECIFIC PERFORMANCE

64.    Wildcat Coal repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

65.    Pursuant to Section 5 of the Nine Mile Draw Area Lease, Bridger Coal is required to conduct its mining operations so as to extract from the Rock Springs Lands over each five-year period of the term not less than forty-five percent (45%) of the total quantity of coal mined from the Rock Springs Lands and the Adjoining Lands combined.  Exhibit A, Section 5.

66.    Pursuant to Section 6 of the Nine Mile Draw Area Lease, Bridger Coal is required to pay Wildcat Coal advance royalties for each five-year period of the term in an amount equal to (a) the amount of Production Royalties which would have been payable to Wildcat Coal during the preceding five-year period if Bridger Coal had satisfied the Forty-Five Percent Production

Threshold, less (b) the Production Royalties and advance royalties actually paid to Wildcat Coal by Bridger Coal during such period.  Exhibit A, Section 6.

67.     The advance royalties assessed under Section 6 of the Lease are intended to serve as Wildcat Coal's sole remedy for Bridger Coal's failure to satisfy the Forty-Five Percent Production Threshold in Section 5 of the Lease during any five-year period, without reference to any production by Bridger Coal from the Rock Springs Lands in excess of the Forty-Five Percent Production Threshold during any prior five-year periods of the term. *See* Exhibit A, Sections 5 and 6.

68.     At all times relevant to this Complaint, the Adjoining Lands have included the Section 11 Lease, the Section 25 Lease, the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands.

69.     Bridger Coal's calculation of the Advance Royalty Payment constitutes a breach of the Nine Mile Draw Area Lease, inasmuch as Bridger Coal counted its coal production from the Section 11 Lease and the Section 25 Lease during the period from January 2016 through December 2020 as coal produced from the Rock Springs Lands, instead of counting coal mined from the Section 11 Lease and the Section 25 Lease as production from Adjoining Lands.

70.     Bridger Coal's calculation of the Advance Royalty Payment constitutes a breach of the Nine Mile Draw Area Lease inasmuch as Bridger Coal did not include its coal mined from the Ten Mile Rim Lease, the BLM Adjoining Lands or the State of Wyoming Adjoining Lands during the period from January 2016 through December 2020 as coal produced from Adjoining Lands when determining the Forty-Five Percent Production Threshold.

71.     Bridger Coal further breached the Nine Mile Draw Area Lease by giving itself a credit for any production in excess of the Forty-Five Percent Production Threshold during all prior

five-year periods to apply against a shortfall in the Forty-Five Percent Production Threshold for the five-year period from January 2016 through December 2020 and for future five-year periods of the Lease term.

72.     Bridger Coal's withholding of all future Production Royalty payments owed to Wildcat Coal until such time as it has fully recouped the Advance Royalty Payment is a breach of the Nine Mile Draw Area Lease.

73.     Wildcat Coal is entitled to specific performance by Bridger Coal of its obligation to pay advance royalties under Section 6 of the Lease calculated based on Bridger Coal's degree of compliance with the Forty-Five Percent Production Threshold during the preceding five-year period, without reference to any production by Bridger Coal from the Rock Springs Lands in excess of the Forty-Five Percent Production Threshold during any prior five-year periods of the term, as Wildcat Coal's sole remedy for Bridger Coal's failure to satisfy the Forty-Five Percent Production Threshold in Section 5.

74.     Wildcat Coal is entitled to specific performance by Bridger Coal of its obligation, in calculating advance royalty payments under Section 6, to include all coal mined from the Section 11 Lease, the Section 25 Lease, the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands as production from Adjoining Lands in determining the Forty-Five Percent Production Threshold for any five-year period of the term.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully asks this Honorable Court to grant judgment in its favor by entering one or more orders containing the following relief:

A.     Awarding Wildcat Coal specific performance from Bridger Coal of its contractual obligation under Section 6 of the Lease to pay advance royalties for each five-year period

calculated upon Bridger Coal's degree of compliance with the Forty-Five Percent Production Threshold during the preceding five-year period, without reference to Bridger Coal's production in any prior five-year period, and without taking a credit in the amount of any production in excess of the Forty-Five Percent Production Threshold during any prior five-year period;

B.      Awarding Wildcat Coal specific performance from Bridger Coal of its contractual obligation under Sections 5 and 6 of the Lease to include all coal production from any areas constituting Adjoining Lands, including the Section 11 Lease, the Section 25 Lease, the Ten Mile Rim Lease, the BLM Adjoining Lands and the State of Wyoming Adjoining Lands, as production from Adjoining Lands in its calculation of the Forty-Five Percent Production Threshold;

C.      Awarding Wildcat Coal money damages against Bridger Coal in the amount of $19,149,346.99 to compensate Wildcat Coal for lost advance royalties resulting from Bridge Coal's improper calculation of the Advance Royalty Payment;

D.      Awarding Wildcat Coal money damages against Bridger Coal in the amount of all Production Royalties improperly withheld by Bridger Coal in order to recoup the Advance Royalty Payment it now alleges was not owed to Wildcat Coal in any amount, which damages total $1,209,854.45 as of the filing of this Complaint, and increase monthly as Bridger Coal continues its wrongful withholding of Production Royalty payments owed to Wildcat Coal;

E.      Awarding Wildcat Coal all interest permitted by law; and

F.      Granting Wildcat Coal such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

DATED:  May 6, 2022

Mistee L. Elliott (Bar #6-3540)
Madeleine J. Lewis (Bar #7-6291)
CROWLEY FLECK
101 West Brundage Street
Sheridan, WY 82801
Telephone:  (307) 673-3000
Facsimile:  (307) 672-1732
Email:  melliott@crowleyfleck.com
            mlewis@crowleyfleck.com

-and-

Brian A. Glasser (*pro hac vice forthcoming*)
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Telephone:  (202) 463-2101
Facsimile:  (202) 463-2103
Email:  bglasser@baileyglasser.com

Ben A. Schwartzman (*pro hac vice forthcoming*)
BAILEY & GLASSER, LLP
950 West Bannock Street, Suite 940
Boise, ID 83702
Telephone:  (208) 342-4411
Facsimile:  (208) 342-4455
Email:  bschwartzman@baileyglasser.com



ORIGINAL



ROCK SPRINGS ROYALTY
COMPANY
LEASE
Audit No. 10-7

# MINING LEASE OF COAL LANDS

## NINE MILE DRAW AREA

(Revised and Restated Effective January 1, 1986)

THIS AGREEMENT, made this first day of January 1986 by and between ROCK SPRINGS ROYALTY COMPANY, a Utah corporation, as successor in interest to UNION PACIFIC RAILROAD COMPANY ("Rock Springs" or "Lessor"), and BRIDGER COAL COMPANY ("Bridger" or "Lessee"), a joint venture between Pacific Minerals, Inc., a Wyoming corporation, and Idaho Energy Resources Co., a Wyoming corporation, as successor in interest to PacifiCorp ("Pacific"), a Maine corporation, formerly known as Pacific Power & Light Company.

RECITALS:

1.   On June 1, 1969, Union Pacific Railroad Company and Pacific entered into a "Mining Lease of Coal Lands Nine Mile Draw Area" ("Lease") pursuant to which Union Pacific leased certain coal lands to Pacific.

2.   Rock Springs and Bridger now desire and do hereby revise and restate said Lease.

3.   Lessee owns the coal leases and coal prospecting permits from the United States and the State of Wyoming which are listed on Exhibit "A" attached hereto and made a part hereof upon the lands located in the Nine-Mile Draw area in Sweetwater County, State of Wyoming, which are described in Exhibit "A".

107 WY 0018 01

Said leases and permits and any contiguous leases or permits acquired hereafter, and the land covered thereby are hereinafter referred to as "Adjoining Lands." Adjoining lands are contiguous to the lands of Rock Springs which are described in Section 1 of this Lease and which are hereinafter referred to as "Rock Springs Lands," or the "Leased Premises."

AGREEMENT:

NOW, THEREFORE, it is agreed as follows:

Section 1.   Rights Granted to Lessee.

The Lessor, for and in consideration of the payments to be made and the covenants and agreements to be kept, observed and performed by the Lessee as herein provided, and upon the terms and conditions hereinafter set forth, hereby grants to the Lessee the exclusive right and privilege to explore for, mine, store, prepare, ship, and dispose of the coal in, upon, and under the Rock Springs Lands hereinafter described, together with the right to make such excavations, openings, stock piles, dumps, ditches, drains, roads, and other improvements upon the said lands as Lessee may deem necessary for efficiently prospecting for and mining said coal and coal mined by Lessee from Adjoining Lands. The Rock Springs Lands are situated in Sweetwater County, State of Wyoming, and are described as follows:

| Township 21 North, Range 101 West, 6th P.M. | Sub-division |
|---|---|
| Section  3 | SE 1/4 |
| Section 11 | All |
| Section 13 | N 1/2 |

2

Township 21 North, Range 100 West, 6th P.M.        Subdivision

|          |    |                     |
|----------|----|---------------------|
| Section  | 7  | All                 |
| Section  | 17 | S 1/2 and NW 1/4    |
| Section  | 19 | N 1/2               |
| Section  | 21 | All                 |
| Section  | 27 | All                 |
| Section  | 29 | NE 1/4 of NE 1/4    |
| Section  | 33 | N 1/2               |
| Section  | 35 | All                 |

Township 20 North, Range 100 West, P.M.        Subdivision

|          |    |                 |
|----------|----|-----------------|
| Section  | 3  | SW 1/4          |
| Section  | 5  | E 1/2           |
| Section  | 9  | All             |
| Section  | 11 | NW 1/4 & S 1/2  |
| Section  | 13 | W 1/2           |
| Section  | 15 | N 1/2           |
| Section  | 23 | All             |
| Section  | 27 | E 1/2           |
| Section  | 35 | All             |

Lessor also grants to Lessee during the term of this Lease the right to develop and use underground waters from the Rock Springs Lands in common with Lessor and other persons upon the condition that any wells drilled by Lessee for such purpose and the right to develop and use such water, together with any Governmental authority or priorities secured by Lessee to appropriate, develop and use such water, shall revert to and become the property of the Lessor upon the termination of this Lease, and Lessee shall execute all documents and take all steps required to vest in Lessor the title to such wells, water rights, and governmental authorities to appropriate, develop and use such water and appurtenant properties.

The rights granted by this Section 1 are granted without covenant of title or for quiet enjoyment, and are subject to

3

all outstanding rights and easements respecting the use of the
Rock Springs Lands and the right of the Lessor to renew and
extend the term of such rights and easements, and without limit-
ing the generality of the foregoing, subject to the following:

Grazing Lease, dated November 24, 1961, and any exten-
sions and amendments thereof between Lessor and the grazing les-
see, Rock Springs Grazing Association.  Lessor has the right to
terminate said Grazing Lease upon ten (10) days' written notice
to the grazing lessee.  Within thirty (30) days after receipt of
written notice from Lessee that it proposes to use a described
portion of Rock Springs Lands for mining purposes which would
interfere with the grazing of livestock or the making of hay
upon such portion, Rock Springs will give notice to the grazing
lessee terminating the said Grazing Lease as to the portion of
the Leased Premises to be used by the Lessee for mining
purposes.

Section 2.  Rights Reserved to Lessor.

It is agreed that the Lessor, its lessees, licensees,
successors, and assigns, may use the Rock Springs Lands for all
purposes not inconsistent with the rights granted hereunder,
including, among other things, the right to prospect for, drill
for, mine and remove from the Rock Springs Lands all minerals
(other than coal) including, but not limited to, oil and gas,
and the right to drill for and develop water, together with all
rights of ingress and egress, and Lessee shall so conduct its
operations hereunder as not to interfere unreasonably with such

4

use; provided, however, that such use of the Rock Springs Lands by Lessor, its lessees, licensees, successors, and assigns, shall not unreasonably interfere with the mining operations and any water supply system of Lessee and shall be in accordance with all applicable laws and regulations.  Lessor agrees to execute a Multiple Mineral Development Agreement acceptable to Lessee prior to leasing, conveying or otherwise encumbering any interest in Lessor's minerals which are not leased herein.  Such Agreement shall be binding on Lessor's other lessees, licensees, successors and assigns that may from time to time use Rock Springs Lands for purposes of exploring for and producing minerals other than coal.

It is further agreed that all valuable minerals other than coal which are produced from the Leased Premises by Lessee in the performance of its mining operations hereunder shall be and remain the property of Lessor.

If any valuable minerals other than coal are discovered upon the Leased Premises and it becomes necessary to remove such valuable minerals to accommodate Lessee's operations, the party hereto discovering the same (or under whose authority the same are discovered) shall forthwith notify the other party in writing.  With said notice if given by Lessor, and within thirty (30) days after receipt of said notice by Lessor if given by the Lessee, Lessor shall advise Lessee in writing whether Lessor desires such valuable minerals to be set aside and saved.  If Lessor shall notify Lessee that Lessor

5

desires such minerals to be set aside and saved, Lessee shall,
at Lessor's expense, set aside, provide storage for, and make
available to Lessor any of such minerals which it shall be
necessary to remove in Lessee's operations; or by written notice
to Lessor, Lessee may elect to retain such minerals and account
to Lessor for the fair market value thereof.  In the latter
event Lessee shall, within twenty (20) days after the end of
each calendar month, report to Lessor the quantity of and pay
Lessor the fair market value of all such minerals produced by
Lessee in the previous calendar month.  Any minerals set aside
and stored for Lessor by Lessee shall be removed by Lessor from
the Leased Premises within a reasonable time and in such manner
as not unreasonably to interfere with Lessee's operations.  If
Lessor shall fail to notify Lessee of Lessor's desires or shall
notify Lessee that Lessor does not desire said minerals to be
set aside and saved, Lessee shall be under no obligation to set
aside and save said minerals; and title to the minerals so
removed shall thereupon vest in Lessee without payment or any
other obligation to Lessor therefor.

Section 3.   <u>Effective Date and Term</u>.

This Revised and Restated Lease shall become effective
as of January 1, 1986 and shall remain in full force and effect
until July 1, 2019, unless sooner terminated as herein provided.
All rights and obligations accruing under this Lease prior to
the effective date of its restatement herein shall be governed
by the provisions from the original lease (dated June 1, 1969,

6

as amended and modified heretofore) except as otherwise provided herein; but otherwise this Revised and Restated Lease shall fully replace and supersede the original Lease.

Section 4.   Possession and Use by Lessee.

(a)   During the term of this Lease, or any extension thereof, Lessee shall have the right to use and occupy so much of the surface or subsurface of the Leased Premises as required for or reasonably incident to the enjoyment and exercise of the rights and privileges granted in Section 1, including, without being limited to, stripping and removing the surface of the land lying above the coal seams in the Leased Premises, and mining, waste disposal, or other operations in connection therewith, and the right to construct, maintain, and use roads, pipelines, shafts, dumps, scales, industrial track or tracks for mining purposes, buildings, and other convenient facilities and works necessary or convenient for such purposes.

(b)   Lessee may use such methods of exploring, mining, or removing said coal from the Leased Premises as it may deem appropriate, including but not limited to the mining technique known as "strip mining," subject to Lessee's compliance with the other terms and conditions of this Lease.  Lessee may also utilize the surface and subsurface of the Leased Premises for all purposes in connection with its mining operations on Adjoining Lands (including depositing overburden from Adjoining Lands on the Leased Premises and vice versa), all as may be convenient or

7

desirable in conducting mining operations on the Leased Premises and Adjoining Lands as a single mine.

(c)  In the conduct of its operations on the Leased Premises, Lessee shall at all times proceed in accordance with good mining and engineering practices and shall so conduct its operations as to avoid waste of or damage to coal, water, or mineral deposits within the Leased Premises or other lands of Lessor, and shall comply with all applicable federal, state, or other governmental orders or regulations governing mining operations and the protection of or restoration of Rock Springs Lands and Adjoining Lands; provided that if Lessee shall in good faith contest or shall institute legal proceedings to determine the validity or application to Lessee's operations of any such law, order or regulation which substantially interferes with or restricts or increases the cost of Lessee's operations, such action on the part of Lessee during the period of such contest or legal proceeding shall not constitute a default by Lessee hereunder.

In the event there are laws or governmental regulations governing mining operations and the protection or restoration of Adjoining Lands which contain higher standards than those contained in laws or governmental regulations relating to Rock Springs Lands, Lessee shall conduct its operations upon Rock Springs Lands and shall take such steps for the protection or restoration of the Rock Springs Lands in the same manner as shall be required by the laws or governmental regulations apply-

8

ing to Adjoining Lands.  Lessee shall promptly furnish to Lessor
a copy of all maps, mining plans, or plans for the restoration
or protection of Rock Springs Lands or Adjoining Lands which
Lessee is required to file from time to time with any competent
governmental authority.

(d)  Before mining coal upon the Leased Premises, Les-
see shall furnish to Lessor its proposed plan of mining and
development with suitable maps depicting said mining plans.  In
the event Lessee shall materially change its plan of mining and
development, it shall promptly furnish to Lessor a revised plan
with appropriate maps.

Section 5.  Production Obligations of Lessee.

Consistent with good engineering practices, Lessee
shall conduct mining operations so as to extract from Rock
Springs Lands over each five-year period of the term of this
Lease commencing January 1, 1986, approximately not less than
forty-five percent (45%) of the total quantity of coal mined
from Rock Springs Lands and Adjoining Lands.  Subject to the
foregoing, Lessee may determine, in its own discretion, the
sequence of extracting coal from Rock Springs Lands and Adjoin-
ing Lands.  Any failure by Lessee to take agreed-upon quantities
of coal from Rock Springs Lands prior to January 1, 1986 is for-
given and Lessor waives any claims it may have in regard to such
failure.

9

Section 6.   Royalty and Other Payments.

A.   On January 1, 1991, and on each fifth anniversary date throughout the term of this Lease, Lessee shall pay to Lessor advance royalties, if any, equal to (i) the amount of Production Royalties computed according to Paragraph B of this Section 6 which would have been payable to Lessor to date under this Agreement had Lessor received Production Royalties on forty-five percent (45%) of all coal mined by Lessor from Rock Springs Lands and Adjoining Lands during such period, less (ii) the Production Royalties and advance royalties actually paid to Lessor by Lessee during such period.   Such advance royalty payments shall be Lessor's sole remedy for Lessee's failure to comply with the provisions of Section 5.

B.   Lessee will pay to Lessor a production royalty on coal mined from the Leased Premises ("Production Royalty") as follows:

(i)   For all coal mined from the Leased Premises, and not used at the Jim Bridger Power Plant, Lessee shall pay a Production Royalty equal to twelve and one-half percent (12 1/2%) of the Sale Price of such coal.   As used herein, the term "Sale Price" shall mean Lessee's net invoice price for such coal, f.o.b. the mine.

(ii)   Each year, until such time as 5,814,000 tons of coal have been mined from the Rock Springs Lands and Adjoining Lands, Lessee shall pay a Production Royalty equal to $2.50 per ton adjusted upward or downward from January 1, 1986 to the

10

month the coal was mined to reflect changes in the Producer's Price Index-Industrial Commodities ("PPIIND").

(iii)  Each year, subsequent to such time as 5,814,000 tons of coal have been mined from the Rock Springs Lands and Adjoining Lands, Lessee shall pay a Production Royalty equal to $2.25 per ton adjusted upward or downward from January 1, 1986 to the month the coal was mined to reflect changes in the PPIIND.

(iv)  For purposes of this Paragraph B, "PPIIND" shall mean the "Producer's Price Index-Industrial Commodities" most recently reported as of the 21st day of the month in question, regardless of whether such reported index is preliminary or final.  Should the United States Department of Labor, Bureau of Labor Statistics, change the basis upon which the PPIIND is calculated, the parties shall attempt to agree to a method of utilizing the revised index.  Should the PPIIND be discontinued, the parties shall attempt to agree upon a new basis for adjusting the royalty payments.  If the parties are unable to agree upon a new method of using a revised index or upon a replacement index within thirty (30) days after the change or discontinuance, any unresolved issues shall be submitted to arbitration pursuant to the provisions described in Section 26 of the Coal Supply Contract dated *January 1, 1986* between Rocky Mountain Energy ("RME") and Pacific ("Contract").

C.   Payment of Production Royalties required by Subparagraphs B(ii) and (iii) of this Section shall be made by

11

check within 14 days after the end of each calendar quarter. Payments may be reduced by advance royalty payments accrued pursuant to Paragraph A to the extent Production Royalties payable in any year exceed the amount which would have been payable to Lessor had forty-five percent (45%) of production that year been from Rock Springs Lands.  Advance Minimum Production Royalty payments outstanding on December 31, 1985, may also be used to reduce Production Royalties payable thereafter.  Lessee shall provide Lessor with a written statement each month showing the amount of coal mined from the Leased Premises during the preceding month.  Lessee shall, upon request, furnish such other data as may be reasonably necessary to enable Lessor to verify the Production Royalty computations.

D.    Lessee shall keep accurate written books and records of all coal mined, removed, sold, or used by Lessee hereunder, including books and records showing the basis on which royalty payments are made to Rock Springs.  Rock Springs shall have the right, for the term of this agreement and for thirty-six (36) months thereafter, during all regular business hours, and after reasonable advance notice to audit such books and records. Acceptance of any royalty payment under this Lease shall not prejudice the right of Rock Springs to protest or question the correctness thereof; provided, however, each such payment made to Rock Springs by Lessee or any statement or accounting in support thereof shall be presumed conclusively to be true and correct after thirty-six (36) months from the end of the year in

12

which Rock Springs receives such payment and/or statement or accounting, unless within the said thirty-six (36) month period Rock Springs takes written exception thereto and makes claim on Lessee for adjustment.  No adjustment favorable to Lessee shall be made unless it is made in the same prescribed period.

Section 7.   Liabilities.

A.    Lessee shall promptly pay all wages and other payments to its workers and employees and pay for all materials and supplies furnished or used on the Leased Premises by Lessee during the continuance of this Lease, and Lessee shall indemnify and save Lessor harmless from and against any liens, charges, and liabilities resulting from its failure to do so.  In the event any such liens are filed against the Leased Premises, Lessee will take such steps as may be necessary to obtain the discharge thereof; provided that Lessee may refrain from discharging such lien while contesting the same in good faith, without being in default hereunder.

B.    Lessee shall at all times during its operations on said Leased Premises comply with all applicable provisions of the Workers' Compensation laws of the State of Wyoming.

C.    Lessee shall indemnify and hold Lessor harmless from and against any and all loss, damage, or expense resulting from injury to or death of persons or damage to property resulting from the operations of Lessee in connection with the Leased Premises; excepting only such injury or death or damage proximately caused solely by the negligent or willful act or omission

13

of Lessor.  Lessor shall indemnify and hold Lessee harmless from and against any and all loss, damage, or expense resulting from injury to or death of persons or damage to property resulting from the inspections, examinations, surveys, measurements or operations of the Lessor, its other lessees, licensees, succes- sors and assigns on the Leased Premises; excepting only such injury or death or damage proximately caused solely by the neg- ligent or willful act or omission of Lessee.

Section 8.  <u>Taxes</u>.

The Lessee, in addition to paying the royalty herein stipulated, shall pay, before the same become delinquent, all taxes and all assessments which, during the term hereof, may be lawfully levied upon or assessed against the Leased Premises, including, among other taxes, mine output taxes, severance taxes, production taxes, and taxes of a similar nature, and upon all structures, improvements, equipment, and other property erected, constructed, installed, and/or used by the Lessee in connection with the exercise of the rights herein granted; pro- vided, however, that in the event Lessor, its lessees, licens- ees, successors, or assigns shall at any time exercise the right to use the Leased Premises as reserved in Section 2 hereof, taxes and assessments levied upon or assessed against such por- tion of the Leased Premises so used shall be equitably appor- tioned as between Lessee and such other user or users.  Nothing in this paragraph contained shall be construed as precluding the Lessee from contesting at its own expense, after written notice

14

to Lessor, the validity of any such tax or assessment, but Lessee shall, in case of contest, indemnify and hold harmless Lessor from and against the payments of any such taxes and assessments for which Lessee is responsible hereunder, together with interest and penalties in connection therewith.

Lessee, upon payment of such taxes and assessments, shall promptly furnish Lessor with satisfactory evidence of such payment.

Section 9.   Inspection.

During the term of this Lease Lessor and its authorized agents shall have the right, at all reasonable times, and after reasonable advance notice, to enter the Leased Premises in order to inspect, examine, survey or measure the same, provided that the exercise of said rights shall be conducted in such a way as not unnecessarily to interfere or conflict with the operations of Lessee and shall be subject to the indemnification provisions set forth in Subsection 7(C).

Section 10.   Improvements, Equipment, and Facilities.

During the term of this Lease and for so long thereafter as Lessee shall continue mining operations upon any part of said Leased Premises, title to any or all buildings or other permanent improvements and to all tools, supplies, materials, machinery, equipment and stockpiles of coal placed by Lessee upon said Leased Premises shall remain in Lessee.  In the event this Agreement is terminated by Lessor or by Lessee as herein provided, or Lessee shall permanently abandon mining operations

upon said Leased Premises, Lessee shall have the right, within a period of one hundred eighty (180) days after such termination, to remove from the Leased Premises any and all tools, supplies, materials, machinery, equipment and stockpiles of coal placed thereon by it except any water wells on Rock Springs Lands and the equipment in and at the wellhead of such wells.  In such event Lessee shall leave the Leased Premises in an orderly and safe condition and in compliance with the laws, ordinances and regulations of the United States, the State of Wyoming, and of the county in which said improvements and Leased Premises are situated; provided, however, if the laws and regulations applicable to Adjoining Lands require higher standards for operations and restoration applicable to Adjoining Lands, Lessee shall leave the Leased Premises in the same condition as required by the laws and regulations applicable to Adjoining Lands.

Section 11.   Reports.

Lessee shall duly and promptly make all reports in respect of its operations upon the Leased Premises required by law to be made to county, state, or federal offices and agencies having jurisdiction over such operations.  Copies of said reports shall be furnished to Lessor upon request.

Section 12.   Extension.

If Lessee shall, during the term of this Lease, well and faithfully keep and perform all the covenants and agreements herein contained on its part to be kept and performed, it shall have the right, upon written notice to Rock Springs within six

16

(6) months prior to the expiration of said term, to an extension of this Lease for an additional twenty-five (25) year period, upon the same terms and conditions contained herein.

Section 13.   Termination.

A.   Termination by Lessor.   In the event Lessee shall fail to make any payment or perform any other substantial obligation hereunder when due, Lessor shall give written notice of such failure to Lessee, and if Lessee shall not correct such failure with sixty (60) days after its receipt of such notice, or if such obligation cannot be performed during such sixty (60) day period, and Lessee shall fail within such period to commence and diligently thereafter pursue such performance, Lessor, at its option, may terminate this Lease and all rights and interests of Lessee hereunder by thirty (30) days' notice in writing to Lessee; provided, however, that failure to make any payment or performance during the period in which there is a bona fide contest by Lessee of any such payment or performance shall not constitute a default hereunder.

B.   Termination by Lessee.   Lessee may terminate this Lease at any time upon thirty (30) days' written notice to Lessor, and any payments theretofore made by Lessee to Lessor hereunder shall remain the sole property of Lessor.   In the event of such termination by Lessee, Lessee shall thereupon have no further right, title, interest or claim to the Leased Premises and shall have no further obligation to make further payments hereunder; provided, however, that upon such termination Lessee

17

shall pay any sums as may have accrued and not yet been paid
under the provisions of Section 6 hereof with respect to mining
carried on between the effective termination date and the last
previous date to which royalties shall have been paid hereunder.
In such event Lessee shall promptly upon request execute and
deliver to Lessor appropriate quitclaim deeds or other instru-
ments sufficient to release to Lessor Lessee's right, title and
interest to the Leased Premises pursuant to the provisions of
this Lease.

Section 14.  Assignment.

(1)  Lessee may assign a partial interest or interests
in this Lease to any entity or entities engaged in the business
of generating and distributing electric power for direct or
indirect sale to the public which may at any time become a co-
owner or co-lessee with Lessee (or a corporation affiliated with
Lessee or Lessee's joint venturers) in any power plant or which
may own or lease an interest in a power plant operated by Lessee
(or a corporation affiliated with Lessee or Lessee's joint
venturers), to which coal for fuel is furnished by Lessee (or a
corporation affiliated with Lessee or Lessee's joint venturers)
from the Leased Premises and Adjoining Lands;

(2)  Lessee may assign its entire interest in this
Lease to any entity to which it, at the same time, transfers all
or substantially all of its assets, properties and franchises;

(3)  Lessee may assign its entire interest in this
Lease to an affiliate (meaning an entity which controls, is con-

trolled by, or is under common control with the entity making

the assignment) of Lessee or of either of Lessee's joint ventur-

ers; and/or;

(4)   Lessee may subject its interest under this Lease

to the lien of any blanket mortgage and deed of trust;

provided, however, that each such assignment shall be

evidenced by execution of an instrument of assignment, an exe-

cuted counterpart of which shall be delivered to Lessor, under

which the assignee shall expressly assume and agree to perform

each and all of the obligations and covenants of Lessee proposed

to be assigned thereunder and provided, further, that no such

assignment shall in any way affect or modify the obligations and

covenants of Lessee hereunder, it being understood and agreed

that, notwithstanding any such assignment, or any subsequent

assignment pursuant to this Section 14, all obligations of Les-

see to the Lessor hereunder shall be and remain enforceable by

the Lessor, its successors and assigns, against Lessee.  Lessee

may not otherwise assign any part of its interest in this Lease

or sublet the Leased Premises in whole or in part without the

prior written consent of Lessor.  Any transfer or assignment of

this Lease or any subletting of any part of the Leased Premises

not authorized by this section, whether voluntary, by operation

of law, or otherwise, without the consent in writing of the Les-

sor, shall be absolutely void and, at the option of the Lessor,

shall terminate this Lease.

<u>Section 15</u>.   <u>Leases on Adjoining Lands</u>.

In the event Lessee shall at any time desire to surrender all or any of the leases on Adjoining Lands to the United States Government or the State of Wyoming, Lessee shall give written notice to Lessor of its intention to make such surrender.  Except to the extent it would be contrary to law, within ninety (90) days after receipt of such notice, Lessor by written notice to Lessee shall have the right to require Lessee to assign to Lessor or to any person, firm, or corporation designated by Lessor all or any part of the said coal leases which Lessee desires to surrender.  Upon receipt of such written notice from Lessor, Lessee and Lessor shall promptly cooperate to take all steps necessary to attempt to secure Governmental consent, as may be required, for the assignment of such leases and to execute all documents necessary to secure such consent and to make the assignment of such leases as requested by Lessor.

If during the term of this Lease, Lessee shall propose to assign or sublet any of the leases on Adjoining Lands at any time except to one or more entities to which it may assign interests in this Lease under Section 14 hereof, Lessee shall first obtain a bona fide written offer from a responsible person, entity or corporation which is ready, willing, and able to sublet or accept an assignment of such leases, which offer shall provide all of the terms and conditions upon which such proposed assignment or subletting will be made.  Lessee shall give to

20

Lessor notice by registered or certified mail of such offer, the notice to be accompanied by a photostatic copy of such offer (with the name of the offeror omitted if desirable to maintain confidentiality).  In the event Lessee shall give Lessor such written notice, and except to the extent it would be contrary to law, Lessor shall have sixty (60) days within which to elect to accept an assignment or subletting of said leases in its name or in the name of any person, firm, or corporation designated by Lessor on the terms and conditions specified in said offer. Such election shall be made by giving written notice to Lessee within said sixty (60) day period by registered or certified mail.  The Lessor and Lessee shall complete said assignment and transfer as promptly as possible.  Lessee and Lessor shall promptly cooperate to take all steps necessary to attempt to secure Governmental consent for the assignment or subletting of such leases and shall execute all documents necessary to secure such consent and to make the assignment or subletting of such leases as requested by Lessor.  If Lessor fails to make its election within such 60 day period, or declines to accept the offered assignment or sublease, Lessee may proceed to make the same without further obligation to Lessor.

In the event Lessee shall assign or sublet all or any part of leases on Adjoining Lands or any interest therein to an entity authorized by Section 14 hereof, Lessee shall require the said entity to agree to be bound by, and to require any person, firm, entity or corporation to whom such entity shall assign or

21

sublet any interest in said leases to be bound by, the provi-
sions of this section.

It is intended that this section shall survive the
termination of this Lease upon Rock Springs Lands and shall con-
tinue in effect so long as the leases on Adjoining Lands or any
portion thereof are in effect.

This Section 15 shall not be deemed to give Lessor a
current or future interest in the leases on Adjoining Lands, and
such interest shall only arise in the event the conditions set
forth herein are satisfied and then existing law and regulations
permit.

The validity and interpretation of this Lease shall be
governed by the laws of the State of Wyoming.  In the event the
provisions of this Section 15 would otherwise be invalid as a
violation of the "Model Rule Against Perpetuities Act" of the
State of Wyoming, the rights herein granted to Lessor shall
cease, determine and be at an end not later than the expiration
of twenty-one (21) years after the death of the last surviving
descendant now living of the late Robert Kennedy, United States
Senator from the State of New York.

Section 16.   Easements.

In the event Lessee shall give written notice to Les-
sor of its intention to commence and thereafter diligently carry
on the mining of coal from the Leased Premises, Lessor, upon
request from Lessee, shall promptly grant to Lessee, in loca-
tions which are mutually agreeable to Lessor and Lessee and

22

which will not be detrimental to the lands of the Lessor, ease-
ments over the lands of Lessor which adjoin the Leased Premises
which will provide reasonable access to the Leased Premises and
Adjoining Lands for the purposes of conducting mining operations
thereon in the manner contemplated by this Lease.  Lessor hereby
acknowledges and agrees to extend, upon reasonable request of
the Lessee, all easements and rights of way previously granted
to Lessee, as they now exist over and across the Leased
Premises.

Section 17.  <u>Waiver and Consent</u>.

The waiver by either party of any breach of any term,
covenant or condition hereof shall not be deemed to be a waiver
of such term, covenant, or condition or of any subsequent breach
of the same or of any other term, covenant or condition herein
contained.  No extension of time by either party for the per-
formance of any act by the other party shall act as a waiver if
default shall continue thereafter beyond such period of time.
The acceptance of payment after the same has become due shall
not be construed as a waiver of any other than the existing
default or failure to perform under this Lease.

Section 18.  <u>Notices</u>.

Notices hereunder shall be in writing and shall be
delivered personally or sent by registered or certified mail to
the parties as follows:

23

To Lessor addressed to:

Rock Springs Royalty Company
10 Longs Peak Drive, Box 2000
Broomfield, Colorado  80020
Attention:  President

To Lessee addressed to:

President
NERCO Coal Company
2043 Woodland Parkway, Suite 300
St. Louis, MO  63146

or to such other officer or officers as such other address or addresses as the parties may from time to time designate in writing.

Section 19.   Force Majeure.

Anything in this Lease to the contrary notwithstanding, it is hereby expressly agreed that the obligations of Lessee, except as to payments required by Lessee under Section 6 hereof, shall be suspended while it is prevented from complying herewith, in whole or in part, by labor disturbances, civil dis orders, war, acts of God, unavoidable accidents, rules and regulations of any federal, state, or other governmental agency under asserted authority, or for any other reason or circum- stance beyond its control, other than financial.

Section 20.   Successors.

Subject to the restrictions herein with respect to assignment, this Lease shall inure to the benefit of and be

binding upon the parties hereto and their respective successors
and assigns.

IN WITNESS WHEREOF, the parties hereto have executed
this Lease by their respective officers thereunto duly author-
ized as of the day and year first hereinabove written.

ROCK SPRINGS ROYALTY COMPANY

Attest:

_Stephen Lesley_        By _Edward C. Gibbs_
Assistant Secretary              Vice President


BRIDGER COAL COMPANY

Attest:

_Paul J. Wardin_        By _(signature)_
     Vice President            President, Pacific Minerals, Inc.
                               EXECUTIVE VICE PRESIDENT

Attest:

_Paul Lawler III_       By _C. E. Bissell_
     Secretary            Vice President,
                          Idaho Energy Resources Co.

STATE OF COLORADO    )
                     )  ss
County of Jefferson  )

        Personally appeared *Edward C Gibbs*, who being duly sworn did say that he is a *Vice President* of Rock Springs Royalty Company and said the foregoing instrument was signed in behalf of said corporation by authority of its board of directors; and he acknowledged said instrument to be its voluntary act and deed.

        Before me:

                *Carol J Glenn*
                Notary Public for Rock Springs Royalty Company
                My commission expires 9/18/1988

STATE OF MISSOURI    )
                     )  ss
County of St. Louis  )

        Personally appeared *Charles C. Adams*, who being duly sworn did say that he is a *Executive Vice-President* of Pacific Minerals, Inc., one of the joint venturers in Bridger Coal Company, and that the foregoing instrument was signed in behalf of said corporation by authority of its board of directors; and he acknowledged said instrument to be its voluntary act and deed.

        Before me:

ANDREA A. TROYER
NOTARY PUBLIC
STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXPIRES APRIL 8, 1988

                *Andrea J. Troyer*
                Notary Public for ~~Mo~~
                My commission expires 4/8/88

STATE OF IDAHO    )
                  )  ss
County of         )

        Personally appeared *C E Birrell*, who being duly sworn did say that he is a *Vice President* of Idaho Energy Resources Co., one of the joint venturers in Bridger Coal Company, and that the foregoing instrument was signed in behalf of said corporation by authority of its board of directors; and he acknowledged said instrument to be its voluntary act and deed.

        Before me:

                *Lucille J Deaton*
                Notary Public for Idaho
                My commission expires 12.31.86

26

EXHIBIT A

NINE MILE DRAW AREA

| LEASE NO. | DATED | T-20-N, R-100-W | SUB-DIV. | |
|---|---|---|---|---|
| W-0313558 | January 1, 1968 | Section 4 | All | |

| | | T-21-N, R-100-W | | |
|---|---|---|---|---|
| | | Section 18 | All | |
| | | Section 20 | All | |
| | | Section 22 | All | |
| | | Section 26 | All | |
| | | Section 28 | All | Total: |
| | | Section 34 | All | 4,275.68 acres |

| PROSPECTING PERMIT | DATED | T-20-N, R-100-W | SUB-DIV. | |
|---|---|---|---|---|
| W-2727 | May 1, 1967 | Section 8 | E 1/2 | |
| | | Section 10 | All | |
| | | Section 14 | All | |
| | | Section 22 | All | Total: |
| | | Section 26 | All | 2,880 acres |

| PROSPECTING PERMIT | DATED | T-21-N, R-101-W | SUB-DIV. | |
|---|---|---|---|---|
| W-2728 | May 1, 1967 | Section 2 | All | Total: |
| | | Section 12 | All | 1,280 acres |

| STATE LEASE | DATED | T-21-N, R-100-W | SUB-DIV. | |
|---|---|---|---|---|
| O-26745 | January 2, 1965 | Section 16 | All | Total: |
| | | Section 36 | All | 1,280 acres |



## AMENDMENT TO AGREEMENTS

THIS AMENDMENT TO AGREEMENTS (the "Amendment"), is made and entered into this __3rd__ day of __Sept.__, 2009 but effective as of the first day of June, 2009 (the "Effective Date"), by and among **ANADARKO LAND CORP.,** a Nebraska corporation (hereinafter "ALC"), **ROCK SPRINGS ROYALTY COMPANY LLC,** Utah limited liability company, (hereinafter "RSRC") and **BRIDGER COAL COMPANY,** a joint venture of Pacific Minerals Inc., a Wyoming corporation and Idaho Energy Resources Company, a Wyoming corporation (hereinafter called "Lessee").

## RECITALS:

WHEREAS, RSRC and Lessee entered into that certain Mining Lease of Coal Lands Nine Mile Draw Area (Revised and Restated Effective January 1, 1986), as amended, dated January 1, 1986 (hereinafter called the "Nine Mile Draw Lease"), which granted Lessee the right to mine and remove coal from lands therein described, a memorandum of which was recorded in Book 1000 at Page 923 of the records of Sweetwater County, Wyoming.

WHEREAS, ALC and Lessee entered into that certain Ten Mile Rim Coal Lease Agreement dated December 22, 2003 (hereinafter called the "Ten Mile Lease"), which granted Lessee the right to mine and remove coal from lands therein described, a memorandum of which was recorded in Book 993 at Page 192 of the records of Sweetwater County, Wyoming. Capitalized terms used in this Amendment and not otherwise defined shall have the meaning set forth in the Ten Mile Rim Lease and or the Nine Mile Draw Lease; and

WHEREAS, ALC, RSRC and Lessee desire to amend the Nine Mile Draw Lease and the Ten Mile Rim Lease (hereinafter sometimes referred to as the "Leases") to (i) establish a uniform production royalty rate for the Leases; (ii) establish a uniform inflation adjustment index for the Leases; (iii) cap the inflation adjustment relative to the production royalty rate contained in the Nine Mile Draw Lease; and (iv) delete the ceiling and floor provision relative to the Production Royalty contained in the Ten Mile Rim Lease.

## AGREEMENT

**NOW THEREFORE** for valuable consideration and the mutual covenants and conditions hereunder set forth, the receipt and sufficiency of which are hereby acknowledged, ALC, RSRC and Lessee hereby agree as follows:

1.     Effective June 1, 2009, section 6. B. of the Nine Mile Draw Lease is hereby deleted in its entirety and the following is substituted therefor:

*WY-018 & WY-661*

B.      Lessee will pay to Lessor a production royalty on coal mined from the Leased Premises as follows:

(i) Lessee shall pay Lessor a production royalty (the "Production Royalty") under this Lease, calculated on the basis of a ton and expressed in U.S. dollars, for each Sale of coal extracted from the Leased Premises, as determined pursuant to such accounting procedure as shall be reasonably acceptable to Lessee and Lessor, completed on and after the date hereof. Payment shall be based on the Sale Price and made each month for the period of production of the preceding calendar month. For purposes of calculation of royalties under this Section 6, there shall not be deducted from the Sale Price (by way of example, but not limitation) any allowances for fees paid by Lessee for sales costs, expenses or commissions, taxes or transportation costs (including transportation from the mine portal to the loadout).

For the purposes of calculating the applicable Production Royalty, the applicable royalty rate shall apply.

a.) In the case of an Arms Length Transaction: Twelve and One-Half percent (12.5%) of the Sale Price; or

b.) In the case of an Intracompany Transfer or a Non-Arms Length Transaction: Three and 05/100 Dollars ($3.05) per ton of coal (hereinafter defined as "Minimum Production Royalty").

As used herein, the following terms shall have the following meanings:

**"Arms Length Transaction"** means any sale, shipment, transfer or other form of disposition of coal by Lessee or a Related Party of Lessee to an entity which is not a Related Party of Lessee, which sale, shipment, transfer or disposition is not an Intracompany Transfer and from which neither the Lessee nor a Related Party of Lessee receives a benefit that is in addition to and/or not reflected in the sales invoice or other record of such transaction upon which Lessor's Production Royalties are based.

**"Intracompany Transfer"** means (i) the removal of any coal from Lessee's Facilities for shipment to another facility owned by Lessee or a Related Party for storage or for use therein, or (ii) the use of any coal at Lessee's Facilities in the creation, processing or production of any product (including power, energy or heat) which is not coal.

**"Lessee's Facilities"** means the mine and equipment utilized by the Lessee for mining, removing, storing and loading of coal mined from the Leased Premises and Adjoining Lands.

**"Non-Arms Length Transaction"** means any sale, shipment, transfer or other form of disposition of coal by Lessee or a Related Party of Lessee which is neither an Intracompany Transfer nor an Arms Length Transaction.

2

"**Sale**" means a transfer of ownership of coal by Lessee or a Related Party of Lessee by virtue of an Arms Length Transaction, a Non-Arms Length Transaction or an Intracompany Transfer.  A Sale shall be deemed to have been completed on the day coal is removed from Lessee's inventory, or, in the case of an Intracompany Transfer, on the day of such transfer.

"**Sale Price**" means, in the case of:

(a)     an *Arms Length Transaction*, the actual price received by Lessee for the sale of coal mined and shipped f.o.b. railroad cars at the point of shipment or f.o.b. over-the-road trucks at point of shipment to Lessee's customers, as applicable.

(b)     an *Intracompany Transfer*, shall be deemed to be a reasonable price and any royalty thereon shall be paid as designated in Section 6.B.(i) of this Agreement and adjusted in accordance with the adjustment provision of Section 6.B.(ii).

(c)     a *Non-Arms Length Transaction*, shall be deemed to be a reasonable price and any royalty thereon shall be paid as designated in Section 6.B.(i) of this Agreement and adjusted in accordance with the adjustment provision of Section 6B.(ii).

"**Related Party**" or "**Related Parties**" means (i) a parent company and its subsidiaries, (ii) subsidiaries of a common parent, (iii) an entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise, (iv) affiliates, or (v) partners.

(ii)   The Minimum Production Royalty referred to in Section 6B(i)(b) above shall be adjusted effective the Adjustment Date, as hereinafter defined, in accordance with the following: (a) the index for computing the adjustments to the Minimum Production Royalty shall be the equally weighted average of the group of indices more fully described below (the "Index"); and (b) if the Index for the first month of the calendar quarter immediately preceding the Adjustment Date (the "Adjustment Index") has changed with respect to the Index published for the first month of the calendar quarter immediately preceding the quarter in which the initiation of mining occurs (the "Beginning Index"), the Minimum Production Royalty for the calendar quarter beginning on the Adjustment Date shall be the product of $3.05 multiplied by a fraction, the numerator of which is the Adjustment Index and the denominator of which is the Beginning Index.

"**Adjustment Date**" relates to the adjustment of the Minimum Production Royalty.  The Adjustment Date shall be the first day of the calendar quarter following June 1, 2009 and thereafter on the first day of each January, April, July and October until termination of the Agreement.

The Indices for computing the adjustments to the Minimum Production Royalty shall be the following:

1.) The Average Hourly Earnings of Production Workers, Bituminous Coal and Lignite Mining.
2.) The Producer Price Index – Industrial Commodities Series Number WPU03thru15.
3.) The Producer Price Index – Construction Machinery and Equipment Series Number WPU112.
4.) The Gross Domestic Product – Implicit Price Deflator for all Commodities (Index numbers, 2005=100) (Currently found on Line 1 of Table 1.1.9).
5.) The Mid-Columbia Power Price. The Mid C Power Price shall be calculated based on the average daily price for firm power for all days in the twenty four (24) month period ending the quarter preceding the new quarter. The source of such pricing shall be the internet site named "Intercontinental Exchange (ICE)", with a website address of www.theice.com. The daily price shall be the weighted average of the Firm On-Peak and Off-Peak power prices and shall be calculated as 16/24 multiplied by the Firm On-Peak price plus 8/24 multiplied by the Firm Off-Peak price.

Notwithstanding anything in the above paragraph to the contrary, in no event shall the aggregate adjustments to the Production Royalty in any calendar year exceed Five percent (5%). In the event the aggregate adjustments to the Production Royalty do exceed such Five percent (5%) limitation in a calendar year, then the adjustments to the Production Royalty, as described in this Section 6, shall be capped on the applicable Adjustment Date and for the remainder of the calendar year in question at amounts that in the aggregate result in an increase (or decrease, as the case may be) in the Production Royalty of exactly Five percent (5%). The adjustments to the Production Royalty shall resume on the first Adjustment Date in the next ensuing calendar year.

2.      Effective June 1, 2009, section 5(b) of the Ten Mile Rim Lease is hereby deleted in its entirety and the following is substituted therefor:

b.) In the case of an Intracompany Transfer or a Non-Arms Length Transaction: Three and 05/100 Dollars ($3.05) per Ton of Coal (hereinafter defined as "Minimum Production Royalty").

3.      Effective June 1, 2009, the last paragraph of section 5 of the Ten Mile Rim Lease that reads as follows is hereby deleted in its entirety.

"Further, following the initiation of actual underground mining, the Production Royalty shall be subject to a floor of no less than One Hundred

Forty percent (140%) and a ceiling of no greater than Two Hundred
Fifteen percent (215%) of the Federal coal production royalty as
calculated for the same period based on the Federal royalty rate being
Eight percent (8%).  For purposes of this calculation, the "value" of the
coal shall be the value determined under the Federal Lease for the time
period in question.  By way of example only, if the Federal royalty per ton
is One Dollar and 28/100, ($1.28) and the Federal royalty rate is Eight
percent (8%) the imputed value would be Sixteen Dollars ($16.00) per ton.
Therefore, based on this example, the Production Royalty due Lessor from
Lessee under this Agreement would not exceed Two Dollars and 75.2/100
($2.752) per ton nor be less than One Dollar and 79.2/100 ($1.792) per
ton."

4.      Effective June 1, 2009, the definition of "Adjustment Date" in the Ten Mile Rim
Lease is amended by deleting the words "following the initiation of mining" and
substituting therefor the words "following June 1, 2009".


        This instrument constitutes an amendment to the Leases and no other
modifications or amendments are applicable to any other provisions or clauses other than
the language contemplated in paragraphs one (1), two (2), three (3), and four (4) above.
Nothing in this amendment entitles any person or party, other than ALC, RSRC and
Lessee, to any claim, cause of action, remedy, or right of any kind, and this amendment is
intended only to benefit the parties hereto and their respective permitted successors and
assigns. As herein amended, all terms of the Leases shall continue in full force and effect
and shall expressly apply in all respects to the subject matter of this Amendment.

THIS SPACE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties have executed this effective the day and year first written above.

Attest:                                    ANADARKO LAND CORP.

_____                    By: _____
Secretary                                  Its: _____


Attest:                                    ROCK SPRINGS ROYALTY
                                           COMPANY LLC

_____                    By: _____
Secretary                                  Its: _____


                                           LESSEE:
                                           BRIDGER COAL COMPANY (a joint
                                           venture of Pacific Minerals Inc. and Idaho
                                           Energy Resources Company)

Attest:                                    Pacific Minerals, Inc.
_____                    By: _____
Secretary                                  Its: _____


Attest:                                    Idaho Energy Resources Company
_____                    By: _____
Secretary                                  Its: _____

6

STATE OF TEXAS )
) ss.
COUNTY OF *Montgomery*

The foregoing instrument was acknowledged before me by *Clay Bretches* as *Vice President* of Anadarko Land Corp. this *3rd* day of *September*, 2009.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:

STATE OF TEXAS )
) ss.
COUNTY OF *Montgomery*

The foregoing instrument was acknowledged before me by *Clay Bretches* as *Manager* of Rock Springs Royalty Company LLC this *3rd* day of *September*, 2009.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:

7

STATE OF _Utah_        )
                       ) ss.
COUNTY OF _Salt Lake_  )

The foregoing instrument was acknowledged before me by _Cindy a. Crane_, as _Vice President_ of Pacific Minerals, Inc. this _16th_ day of _September_, 2009.

WITNESS my hand and official seal.

_Carol M. Sabol_
Notary Public

My commission expires: 07/12/2011

CAROL M. SABOL
NOTARY PUBLIC • STATE of UTAH
9469 W. NORTH TEMPLE
SUITE 320
9469 LAKE CITY, UT 84116
COMM. EXP. 07/12/2011

STATE OF _Idaho_    )
                    ) ss.
COUNTY OF _Ada_     )

The foregoing instrument was acknowledged before me by _Darrel T. Anderson_, as _V.P. & Treasurer_ of Idaho Energy Resources Company this _29th_ day of _September_, 2009.

WITNESS my hand and official seal.

_Mary Gray_
Notary Public

My commission expires: 7/17/09

MARY GRAY
NOTARY
PUBLIC
STATE OF IDAHO

8



THE STATE OF      WYOMING

David D. Freudenthal, Governor

John Cox, Director

# Department of Transportation

3411 SOUTH 3RD STREET                    LARAMIE, WYOMING  82070

May 9, 2008

Anadarko Land Corp.
P.O. Box 1330
Houston, TX  77251-1330

RE: Materials Agreement
File No. 60332
Carbon County

To Whom It May Concern:

Enclosed is a copy of the recorded Materials Agreement, File No. 60332 for your records.

Sincerely,

Margaret Biggs
Margaret Biggs
District 1 Finals Supervisor

cc:    File



# Land > Grants To Others > Agreement & Amendment



**1198177**

| | |
|---|---|
| Sender Name: | Marilyn Presgrove |
| Date Created: | 01/22/2010 |
| Barcode Expires: | **02/21/2010** |
| Department: | Land Record |
| Security: | Non-Privileged |

BLACK AND WHITE DOCUMENT

| Attribute | Value |
|---|---|
| Description | AMENDMENT TO BRIDGER COAL LEASES WY018 AND WY661 |
| Document Date | 09/03/2009 |
| GTO Number | WY-HRG000018/001 , WY-HRG000661/001 |
| Grant Type | MINERAL LEASE |
| Grantee Name | BRIDGER COAL COMPANY |
| Prospect Name | NOT PROJECT RELATED |
| State County | WYOMING:SWEETWATER(037) |

Create another submittal sheet:

New | Based On This One



EXHIBIT
C

 **PACIFIC MINERALS, INC.**
A SUBSIDIARY OF PACIFICORP

1407 West North Temple, Suite 110
Salt Lake City, UT 84116

_**SENT VIA E-MAIL AND U.S. MAIL**_

December 20, 2018

Phillip Holmes
Land Manager
**Anadarko Petroleum Corporation**
1099 18th Street, Suite1800
Denver, CO 80202

**RE:**  _**Bridger Coal Company – Notice of Lease Extension for an Additional 25 Years, Mining Lease of Coal Lands Nine Mile Draw Area, Revised and Restated Effective January 1, 1986, Sweetwater County, Wyoming**_

Dear Mr. Holmes:

On behalf of Bridger Coal Company and its joint venture partners consisting of Pacific Minerals, Inc. and Idaho Energy Resources Co., collectively we hereby provide written notification in accordance with Section 12 of the Mining Lease of Coal Lands Nine Mile Draw Area, Revised and Restated Effective January 1, 1986, to extend this Lease for an additional twenty-five (25) year period, upon the same terms and conditions contained within and as amended.

Should you have any questions or need any additional information, please feel free to contact Scott Child at 801-220-4612 or by email at Scott.Child@PacifiCorp.com.

Respectfully,

Dana M. Ralston
Vice President

SMC\Bridger\ANADARKO2018-01(CoalMiningLease-NineMileDraw-LeaseExtensionNotice).docx

cc:    PMI – D. Ralston, B. Davis
       PacifiCorp Fuel Resources – B. Morgan, B. Greer, J. Potter
       BCC – J. Brown, S. Palmer, N. Hargis
       IERCO – T. Harvey, E. Finley, P. Harrington
       Anadarko – F. Mesa



# WILDCAT COAL LLC

June 29, 2021

Jeff Potter
PacifiCorp Fuel Resources
1407 W. North Temple, Suite 110
Salt Lake City, UT 84116

**Re: Nine Mile Lease Production Obligation**

Dear Mr. Potter:

We are in receipt of your letter dated January 13th, 2021, concerning Section 5 and Section 6 of the Nine Mile Lease's 45% minimum production obligation. However, Wildcat Coal LLC does not agree with, and takes exception to, the calculations and payment. Pursuant to Section 6 (D), please allow this to serve as our written exception to said calculations and payment along with our claim for an adjustment.

In order to examine and confirm the exact amount of adjustments required to comply with the Lease, I am making an information request to facilitate and expedite this process. The specific pieces of information requested, at this stage, are as follows:

1. All production data from 1986 to present on the Nine Mile Lease;

2. Individual production data from other lease agreements, permits, and owned property that are considered adjoining lands, as defined in Recital 3 and are contiguous to the Rock Springs Lands as defined in Section 1 of the Nine Mile Lease.

3. A signed copy of the June 1st, 1966, Lease Agreement.

4. Sales price data matching request No. 1.

5. Any letter notifications concerning the 45% minimum production obligation from 1986 to present.

We look forward to receiving this information so the proper adjustments can be calculated. Please provide this material, in full, within fourteen (14) days of the date of this letter so this process can move forward.

I look forward to working with you through this process and if you have any questions please let me know.

1

Sincerely

Chad Salyer
President
Wildcat Coal LLC
250 W. Main Street, Suite 2000
Lexington, KY 40507
Phone: 606-874-1048 Ext. 406
csalyer@blackhawkmining.com


CC: PMI: Dana M. Ralston, Scott Child, Bret Morgan, Brian Greer





Richard R. Hall
201 S Main Street, Suite 1100
Salt Lake City, UT  84111
D. 801.578.6960
richard.hall@stoel.com

JANUARY 13, 2022

**EMAIL: csalyer@blackhawkmining.com**

Wildcat Coal LLC
Attn: Chad Salyer, President
250 W. Main Street, Suite 2000
Lexington, KY 40507

Re:     **Nine Mile Draw Area Lease Advance Royalty Payment**

Dear Chad:

As you are aware, Bridger Coal Company ("Bridger Coal") and Wildcat Coal LLC ("Wildcat") are parties to that certain Mining Lease of Coal Lands – Nine Mile Draw Area dated January 1, 1986, as amended (the "Nine Mile Lease").

Pursuant to Section 5 of the Nine Mile Lease, Bridger Coal has an obligation to "extract from Rock Springs Lands over each five-year period of the term of this Lease commencing on January 1, 1986, approximately not less than forty-five percent (45%) of the total quantity of coal mined from the Rock Springs Lands and Adjoining Lands."  On December 30, 2020, PacifiCorp, on behalf of Bridger Coal, provided notification to Wildcat that production from the "Rock Springs Lands" for the 5-year period from January 2016 through December 2020 may result in a shortfall from the 45% production requirement set forth under Section 5.  Following a review of the production numbers after year end, Bridger Coal made a preliminary payment for a shortfall of 846,600 tons for $2,923,309.80 for that period to Wildcat by wire transfer on January 13, 2021.  This shortfall from 2016 to 2020 was the first occurrence of a 5-year period shortfall since the commencement of the amended Nine Mile Lease term.

PacifiCorp is also in receipt of your June 29, 2021 letter wherein you requested additional information regarding the Nine Mile Lease and historic production and sales data.  It is our understanding that the data has been fully disclosed to you in connection with the recently undertaken audit.

Upon further review of the Nine Mile Lease provisions, Bridger Coal has determined that the payment made on January 13, 2021 was not required under the lease terms. Section 5 of the Nine Mile Lease establishes the 45% coal production obligation based on distinct 5-year periods.

Wildcat Coal, LLC
Page 2

Section 5, however, does not impose or govern the royalty calculation methodology.  The 5-year time period established under Section 5 applies only to the coal production obligation.

The calculation methodology for the "advance royalties" under the Nine Mile Lease is set forth under Section 6A., which provides:

> On January 1, 1991, and on each fifth anniversary date throughout the term of this Lease, Lessee shall pay to Lessor advance royalties, if any, equal to (i) the amount of Production Royalties computed according to Paragraph B of this Section 6 which would have been payable to Lesser *to date under this Agreement* had Lessor received Production Royalties on forty-five percent (45%) of all coal mined by Lessor from Rock Springs Lands and Adjoining Lands *during such period*, less (ii) the Production Royalties and advance royalties actually paid to Lessor by Lessee *during such period*. Such advance royalty payments shall be Lessor's sole remedy for Lessee's failure to comply with the provision of Section 5.  (*Emphasis added*)

In contrast to the distinct 5-year time period under Section 5 tied to the 45% coal production obligation, the "advance royalties" methodology under Section 6 implements a cumulative time period that ties back to and continuously increases from the January 1, 1986 effective date of the Nine Mile Lease.  Any production in excess of the 45% production obligation under Section 5 during the term of the Nine Mile Lease will result in a production royalty credit that will be applied against any failure to meet the 45% production obligation in later years (5-year distinct periods) of the Nine Mile Lease term.

Up until the 2016 to 2020 5-year period, coal production from the "Rock Springs Lands" well exceeded the 45% production obligation set forth under Section 5 of the Nine Mile Lease. Therefore, pursuant to Section 6 of the Nine Mile Lease, Bridger Coal accrued an advance royalties credit against any future coal production shortfalls.  Based on Bridger Coal's calculations, as of December 31, 2020, Bridger Coal has accrued a royalty offset credit of approximately 10.5 million tons, which should have been applied against the 2016-2020 coal production shortfall, with the remaining credit applying to any future production shortfall.

In light of the foregoing, commencing with the Nine Mile Lease production royalty payment due on January 31, 2022, PacifiCorp (on behalf of Bridger Coal) will begin crediting the $2,923,309.80 previously paid to Wildcat on January 13, 2021 against future production royalty payments owed under the Nine Mile Lease.  Please let us know if you would like to discuss this matter further.

Best regards,

*Richard R. Hall*

Richard R. Hall

Wildcat Coal, LLC
Page 3


cc:    James Owen
       Richard Garlish
       Jason Branch
       Randy Henderson
       Cheryl Thompson
       Jeff Potter
       Brian Greer
       Brad Davis





# WILDCAT COAL LLC

250 West Main Street, Suite 2000
Lexington, KY 40507

March 4, 2022

**Via Certified Mail and Electronic Mail**
Bridger Coal Company
c/o PacifiCorp Fuel Resources
ATTN: Jeffrey Potter
1407 W. North Temple, Suite 110
Salt Lake City, UT 84116
Email: Jeff.Potter@pacificorp.com

> **Re:**   **Notice of Breach and Demand for Cure with respect to Advance Royalty Payment and Production Royalties under Mining Lease of Coal Lands Nine Mile Draw Area dated January 1, 1986 between Wildcat Coal LLC ("Wildcat"), Lessor, and Bridger Coal Company ("Bridger Coal"), Lessee, as amended (the "Lease")**

Dear Jeff:

Please be advised that Wildcat disputes the adequacy of the $2,923,309.80 advance royalty payment Bridger Coal made in January 2021 for the five-year period from January 2016 through December 2020 under Section 6 of the Lease (the "**Advance Royalty Payment**"). This letter shall serve as notice pursuant to Section 13.A. of the Lease of Bridger Coal's breach of Section 6 by failing to properly account for coal production from the "Rock Springs Lands" and the "Adjoining Lands" during the five-year period from January 2016 through December 2020, and thereby miscalculating and underpaying the advance royalties due to Wildcat for this period.  This letter shall further serve as written notice pursuant to Section 13.A. that Wildcat considers Bridger Coal's withholding of production royalties due under the Lease to recoup the Advance Royalty Payment, which you now maintain you did not owe in any amount, to be a material breach of the Lease.  We ask that Bridger Coal correct both of these failures within sixty (60) days.  Wildcat's objections to Bridger Coal's performance in respect of its advance royalty payment and production royalty payment obligations under the Lease are as follows:

<u>**Miscalculation and Underpayment of the Advance Royalty Payment**</u>:

As you know, Section 5 of the Lease requires Bridger Coal to conduct its mining operations in a manner to extract from the "Rock Springs Lands" during each five-year period of the term not less than forty-five percent of your total coal production from the "Rock Springs Lands" together with the "Adjoining Lands" you also lease.  Under Section 6 of the Lease, the advance royalty

Jeffrey Potter
March 4, 2022
Page 2

payment due for each five-year period is based on Bridger Coal's degree of compliance with the forty-five percent production requirement, such that the payment is calculated as (a) the amount of production royalties that would have been paid to Wildcat during the five-year period if Bridger Coal had satisfied the forty-five percent production requirement, less (b) the production royalties actually paid to Wildcat during the same period for coal mined from the "Rock Springs Lands". Based on information you provided in response to our audit request regarding Bridger Coal's production during the 2016-2020 period, it is clear Bridger Coal miscalculated the Advance Royalty Payment in a manner that resulted in a substantial underpayment of the advance royalties due to Wildcat.

Specifically, Bridger Coal counted production from its Section 25 and Section 11 leases from Wildcat as production from the "Rock Springs Lands" when it should have been treated as production from "Adjoining Lands" in calculating the forty-five percent production requirement to determine the advance royalties owed. Briger Coal also failed to include production from several "Adjoining Lands" in the advance royalty calculation entirely. Based on the production information you provided Wildcat for the 2016-2020 period, Bridger Coal's Advance Royalty Payment should have counted production from the following areas as production from "Adjoining Lands": (i) Bridger Coal's Ten Mile Rim lease from Wildcat; (ii) Bridger Coal's Section 11 lease from Wildcat; (iii) Bridger Coal's Section 25 lease from Wildcat; (iv) Bridger Coal's Bureau of Land Management ("**BLM**") lease at T-22-N-R-101-W, Section 26 (UGM); (v) Bridger Coal's BLM lease at T-22-N, R-101-W, Section 34 (UGM); (vi) Bridger Coal's BLM lease at T-21-N, R-101-W, Section 2 (UGM); (vii) Bridger Coal's BLM lease at T-21-N, R-100-W, Section 6 (UGM); (viii) Bridger Coal's BLM lease at T-21-N, R-101-W, Section 12 (UGM); (ix) Bridger Coal's State of Wyoming lease at T-22-N, R-101-W, Section 36 (R15UGM-MM); (x) Bridger Coal's State of Wyoming lease at T-22-N, R-101-W (UGM-R8SP); and (xi) Bridger Coal's State of Wyoming lease at T-20-N, R-100-W, Section 36 (Surf).

Moreover, the Lease defines "Adjoining Lands" as "the coal leases and coal prospecting permits from the United States and the State of Wyoming which are listed on Exhibit 'A'" to the lease **_and_** "any contiguous leases or permits" acquired after the date of the lease. *See* Lease, Recital 3. If Bridger Coal produced coal from any "Adjoining Lands" during the 2016-2020 period that are not identified in items (i) through (xi) above, production from those additional "Adjoining Lands" likewise should have been counted as production from "Adjoining Lands" in calculating the Advance Royalty Payment.

When Bridger Coal's production during the 2016-2020 period from the lands identified in items (i) through (xi) above is counted as production from "Adjoining Lands", as it should have been, the resulting advance royalty payment owed to Wildcat under Section 6 of the Lease is $22,072,656.79. Thus, your miscalculation and remittance of the Advance Royalty Payment resulted in an underpayment of advance royalties to Wildcat in the amount of $19,149,346.99. If Bridger Coal produced coal from any additional Adjoining Lands not identified in (i) through (xi) above during the 2016-2020 period, the advance royalties actually owed to Wildcat, and Bridger Coal's resulting underpayment, are even greater. Please advise immediately whether Bridger Coal produced coal from any additional Adjoining Lands during the 2016-2020 period and provide production information.

Jeffrey Potter
March 4, 2022
Page 3

**Crediting of "Excess Production" against Future Advance Royalty Payments and
Withholding of Production Royalties to Recoup the Advance Royalty Payment**:

Notwithstanding your remittance of the Advance Royalty Payment, you have subsequently taken the position that no advance royalties were actually owed to Wildcat. We strongly object to your recent reinterpretation of the advance royalty provision to allow Bridger Coal to take a credit in the amount of production in excess of the forty-five percent production requirement during prior five-year periods of the lease against any production shortfalls in respect of the forty-five percent production requirement in future five-year periods. Under the express language of the Lease, Section 5 obligates Bridger Coal to satisfy the forty-five percent production requirement during every five-year period of the term, and the advance royalty payment in Section 6 is intended to serve as Wildcat's sole remedy for your failure to comply with the forty-five percent production requirement during any five-year period.

Please be advised that Wildcat objects to Bridger Coal's plan to withhold payment of future production royalties until you have recouped the Advance Royalty Payment in full. Your recalculation of the advance royalties due to Wildcat to zero out the Advance Royalty Payment and to leave an "excess production" credit to be applied toward the advance royalty calculation for future five-year periods is an obvious and material breach of the Lease. Additionally, the Lease gives you no setoff rights or any other basis to withhold undisputed production royalty payments.

As of the date of this letter, Bridger Coal has paid $2,923,309.80 in advance royalties for the 2016-2020 period against an advance royalty payment obligation of $22,072,656.79, and has improperly withheld $389,481.95 in production royalties owed. Please make payment to Wildcat in the total amount of **$19,538,828.80** plus any additional production royalties withheld by you after the date of this letter to cure the advance royalty payment deficiency and your improper withholding of production royalties within sixty (60) calendar days. Please also provide production information in respect of the 2016-2020 period for all areas constituting additional "Adjoining Lands" under the Lease. Wildcat Coal reserves all rights and remedies with respect to the foregoing breaches, and expressly reserves the right to increase the amount of this demand to include any additional advance royalties owed to Wildcat based on inclusion of production from additional Adjoining Lands in the advance royalty calculation, as well as any additional production royalties Bridger Coal may withhold after the date of this letter.

Sincerely,

Chad Salyer, President
Wildcat Coal LLC

cc:  Richard R. Hall
    Brian A. Glasser, Bailey & Glasser, PLLC
    Ben A. Schwartzman, Bailey & Glasser, PLLC





EXHIBIT
G

Richard R. Hall
201 S Main Street, Suite 1100
Salt Lake City, UT  84111
D. 801.578.6960
richard.hall@stoel.com

May 2, 2022

**VIA EMAIL: bglasser@baileyglasser.com**

Brian A. Glasser
Bailey Glasser
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007

**Re:     Response to Wildcat Demand Letter**

Dear Brian:

This letter is provided in response to Wildcat Coal LLC's ("Wildcat") demand letter dated March 4, 2022 (the "Demand Letter") to my client, Bridger Coal Company ("Bridger Coal"), alleging a breach of Bridger Coal's advanced royalty obligations under that certain Mining Lease of Coal Lands Nine Mile Draw Area dated January 1, 1986 (the "Nine Mile Lease").  Bridger Coal disagrees with Wildcat's default claims.

**Production Royalty Calculation**

In its demand letter, Wildcat claims that Bridger Coal is in default of its advance royalty payment obligations under the Nine Mile Lease.  Wildcat's claim is based on an incorrect understanding of the advance royalty calculation methodology set out under Section 6A of the Nine Mile Lease and assumes the advance royalty payment is a 5-year, recurring true-up payment, which it is not.

Your client is correct that Section 5 of the Nine Mile Lease establishes the 45% coal production obligation based on distinct 5-year periods (although Bridger Coal disagrees with Wildcat's expansive interpretation of "Adjoining Lands").  However, as outlined in our January 13, 2022 letter, Section 5 does not impose or govern the royalty calculation methodology.  The 5-year period set out under Section 5 applies only to the coal production obligation.

The "advance royalties" calculation methodology is set out under and governed by Section 6A of the Nine Mile Lease.  I refer you to our detailed explanation of this provision in our January 13th letter.   Under Section 6A, the "Lessor" (currently Wildcat) is ensured that <u>over the life of the lease</u>, the Lessor receives production royalty payments equal to 45% of the total quantity of coal mined from the "Rock Springs Lands" and "Adjoining Lands."  Nothing in Section 6A suggests

Wildcat Coal, LLC
Page 2

the advance royalty is to be calculated on distinct 5-year periods, or that it is intended to be treated as a true-up payment as claimed by Wildcat.  Rather, the 6A advance royalty payment is calculated over the entire term of the Nine Mile Lease, and is "Lessor's sole remedy for Lessee's failure to comply with the provisions of Section 5." As Lessor, Wildcat does not have a separate remedy to pursue a true-up payment for each distinct 5-year period under Section 5.

In its demand letter, Wildcat incorrectly summarizes the advance royalty obligation under Section 6A as follows:

"the [advance royalty] payment is calculated as (a) the amount of production royalties that would have been paid to Wildcat **during the five-year period** if Bridger Coal had satisfied the forty-five percent production requirements, less (b) the production royalties actually paid to Wildcat **during the same period** for coal mines from the 'Rock Springs Lands'." (*emphasis added*)

Wildcat's summary, particularly with respect to the payment periods, does not align with the Nine Mile Lease language. Section 6A states that the advance royalty is based on:

1.  Production Royalties that would have been payable "**to date under this Agreement**" had Lessor received Production Royalties on 45% of all coal mined from Rock Springs Lands and Adjoining Lands "**during such period**," <u>minus</u>
2.  Production Royalties and advance royalties actually paid "**during such period**."

"To date under this Agreement" does not refer to a distinct 5-year term, but rather the entire period of the Nine Mile Lease, and "during such period" refers back to the period "to date under this Agreement."  Wildcat's argument that the advance royalty should be treated as a true-up payment calculated on 5-year periods is simply not supported by the language of Section 6A, or any other provision in the Nine Mile Lease.

As explained in our earlier letter, up until the 2016 to 2020 5-year period, coal production from the "Rock Springs Lands" well exceeded the 45% production obligation set forth under Section 5 of the Nine Mile Lease. Therefore, applying the advance royalty calculation methodology in Section 6A, "to date under this Agreement," Bridger Coal has accrued an advance royalty credit against any future coal production shortfalls in the amount of approximately 10.5 million tons, which should have been applied against the 2016-2020 coal production shortfall, with the remaining credit applying to any future production shortfall.

Please direct any further correspondence regarding this matter to me.

Best regards,

*Richard R. Hall*

Richard R. Hall

Wildcat Coal, LLC
Page 3


cc:     Bradley Davis
        James Owen
        Jayson Branch
        Richard Garlish
        Marie Durrant
        Brian Greer
        Jeff Potter
        Randy Henderson
        Cheryl Thompson