

**FILED**

*1:11 pm, 8/29/23*

**Margaret Botkins
Clerk of Court**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

WILDCAT COAL LLC,

     Plaintiff,

vs.

PACIFIC MINERALS, INC. and IDAHO
ENERGY RESOURCES CO. doing
business together as a joint venture under
the trade name BRIDGER COAL
COMPANY,

     Defendants.

Case No.  22-CV-0102

---

### AMENDED DECISION AND ORDER GRANTING IN PART AND DENYING IN PART ALL PENDING MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING AS MOOT DEFENDANTS' MOTION TO STRIKE

---

THIS MATTER comes before the Court on cross motions for summary judgment by Wildcat Coal LLC (Wildcat) and Pacific Minerals, Inc. and Idaho Energy Resources Co. (collectively "Bridger"). CM/ECF Document (ECF) 43, 45.  Bridger also filed a motion to strike the declaration of Andrew E. Fox, P.E. (ECF 44-1), which relates to the pending cross motions for summary judgment. ECF 56.  These motions have been fully briefed and are ready for disposition. ECF 44, 46, 55, 57, 58, 59, 60, 61, 65.

This is a contract case involving the interpretation of a coal mining lease ("the Nine Mile Lease"), and more specifically whether Bridger owes Wildcat an Advance Minimum Production Royalty payment under the Nine Mile Lease for the five-year period from

January 2016 to December 2020, and if so, what amount is due.  Finding and concluding

that the Nine Mile Lease is unambiguous as to the issues involved in the dispute, the Court

concludes that Section 6.A of the Nine Mile Lease, and specifically the phase which refers

to production royalties which would have been payable "to date under this Agreement,"

allows Bridger to credit, based on five-year increments, the production royalties actually

paid to the lessor on production above the 45% minimum production obligation during the

entire term of the Nine Mile Lease, against any advance royalties which would be payable

should Bridger fail to meet the minimum production requirement in Section 5 of the Lease

during a subsequent five-year period.   The Court further concludes that the phrase

"Adjoining Lands" includes all leases and permits contiguous to the "Rock Springs Lands"

identified in the Nine Mile Lease, including leases with private parties and leases governing

underground mining operations.

## BACKGROUND

Bridger owns and operates the Bridger Mine, which encompasses over 28,000

"checkerboard"[1] acres of federal, state and private land.[2] ECF 48-1, p. 2.  In 1986, Bridger

and Wildcat's predecessor-in-interest entered into the Nine Mile Lease which granted

Bridger the right to mine the "Rock Springs Lands."[3] ECF 44-3; 48-1, p. 2 (depiction).  The

Nine Mile Lease requires Bridger to meet a minimum production obligation for coal mined

---

[1] The checkerboard was created when Congress granted alternating sections to the Union Pacific Railroad to incentivize construction of a transcontinental railroad. *See Leo Sheep Co. v. United States*, 440 U.S. 668, 676 (1979).
[2] On the effective date of the Nine Mile Lease, Wildcat's predecessor-in-interest Rock Springs Royalty Company (RSRC) owned all the privately held coal lands in the Nine-Mile Draw area.  RSRC is a successor-in-interest to Union Pacific.
[3] The Nine Mile Lease was renewed in 2019 for an additional 25 years. ECF 46, p. 8.

from Rock Springs Lands over a five-year period equal to approximately forty-five percent of the total quantity of coal mined from Rock Springs Lands and "Adjoining Lands" as that phrase is defined by the Nine Mile Lease. If Bridger does not meet this minimum production obligation, Bridger must calculate whether advance royalties are due, and pay such royalties to the lessor.

Bridger contends it exceeded the minimum production obligation for every five-year period from 1986 to 2016 but admits it had a shortfall for the period from January 2016 to December 2020. ECF 46, p. 7. Bridger initially calculated an advance minimum production royalty in the amount of $2,923,309.80, and paid Wildcat that amount. However, Wildcat told Bridger the amount was underpaid because Bridger had improperly excluded coal production from Adjoining Lands in calculating the advance royalty due. Bridger then concluded it miscalculated the advance minimum production royalty and no payment was owed. To recoup what Bridger concluded was an erroneous payment, it withheld $2,923,309.80 in production royalty payments payable to Wildcat. Bridger also disagreed with Wildcat's interpretation of Adjoining Lands, contending that this phrase does not include private leases or leases allowing underground mining.

Consequently, the parties' dispute over the calculation of the advance minimum production royalty and the meaning of Adjoining Lands is now before the Court.

The relevant provisions of the Nine Mile Lease are as follows:

**Adjoining Lands**. ECF 44-3, ¶ 3:

[RSRC] owns the coal leases and coal prospecting permits from the United States and the State of Wyoming which are listed on Exhibit "A" attached hereto and made a part hereof upon the lands located in the Nine-Mile Draw

3

area…. Said leases and permits and any contiguous leases or permits acquired hereafter, and the land covered thereby are hereinafter referred to as "Adjoining Lands." Adjoining lands are contiguous to the [Rock Springs Lands].

**Production Obligations of Lessee**. *Id.,* § 5.

Consistent with good engineering practices, Lessee shall conduct mining operations so as to extract from Rock Springs Lands over each five-year period of the term of this Lease commencing January 1, 1986, approximately not less than forty-five percent (45%) of the total quantity of coal mined from Rock Springs Lands and Adjoining Lands. Subject to the foregoing, Lessee may determine, in its own discretion, the sequence of extracting coal from Rock Springs Lands and Adjoining Lands. ….

**Royalty and Other Payments**. *Id*., § 6

A. On January 1, 1991, and on each fifth anniversary date through the term of this Lease, Lessee shall pay to Lessor advance royalties, if any, equal to (i) the amount of Production Royalties computed according to Paragraph B of this Section 6 which would have been payable to Lessor to date under this Agreement had Lessor received Production Royalties on forty-five percent (45%) of all coal mined by Lessor from Rock Springs Lands and Adjoining Lands during such period, less (ii) the Production Royalties and advance royalties actually paid to Lessor by Lessee during such period. Such advance royalty payments shall be Lessor's sole remedy for Lessee's failure to comply with the provisions of Section 5.

B. Lessee will pay to Lessor a production royalty on coal mined from [Rock Springs Lands] as follows: [detailed provisions which specify Lessee's production royalty obligations either as a percent of the sales price for coal not used at the Jim Bridger Power Plant, or an amount per ton for coal used at the Plant, adjusted after a set tonnage has been mined from the Rock Springs Lands and Adjoining Lands, and further adjusted upward or downward to reflect changes in the "Producer's Price Index-Industrial Commodities" calculated by the U.S. Department of Labor, Bureau of Labor Statistics].

C. Payment of Production Royalties … shall be made by check within 14 days after the end of each calendar quarter. Payments may be reduced by advance royalty payments accrued pursuant to Paragraph A to the extent Production Royalties payable in any year exceed the amount which would

have been payable to Lessor had forty-five percent (45%) of production that year been taken from Rock Springs Lands.

**Leases on Adjoining Lands**. *Id*., § 15

In the event Lessee shall at any time desire to surrender all or any of the leases on Adjoining Lands to the United States Government or the State of Wyoming, Lessee shall give written notice to Lessor of its intention to make such surrender.  Except to the extent it would be contrary to law, within ninety (90) days after receipt of such notice, Lessor by written notice to Lessee shall have the right to require Lessee to assign to Lessor or to any person, firm, or corporation designated by Lessor all or any part of the said coal leases which Lessee desires to surrender. …

If during the term of this Lease, Lessee shall propose to assign or sublet any of the leases on Adjoining Lands at any time Lessee […] shall give to Lessor notice by registered or certified mail of such offer….  In the event Lessee shall give Lessor such written notice, and except to the extent it would be contrary to law, Lessor shall have sixty (60) days within which to elect to accept an assignment or subletting of said leases in its name or in the name of any person, firm, or corporation designated by Lessor on the terms and conditions specified in said offer….

## APPLICABLE LEGAL STANDARDS

"The Court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020). "A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Delsa Brooke Sanderson v. Wyoming Hwy. Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020) (citations and internal quotation marks omitted). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

5

This Court has diversity jurisdiction in this case. In diversity cases, the *Erie* doctrine instructs that federal courts must apply state substantive law and federal procedural law. *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216–17 (10th Cir. 2011). The Nine Mile Lease is in Wyoming, and the lease provides that Wyoming law shall govern.

The pending motions arise in the context of a coal lease, which is a contract to be interpreted under the general principles of contract interpretation. *Wyo. Bd. of Land Comm'rs v. Antelope Coal Co*., 185 P.3d 666, 668 (Wyo. 2008). "The purpose of interpretation or construction of any contract is to ascertain the true intent of the parties." *Emulsified Asphalt, Inc. of Wyoming v. Transportation Comm'n of Wyoming*, 970 P.2d 858, 864 (Wyo. 1998). Once the Court determines a contract is unambiguous, "we determine the intention of the parties from the words of the contract and the context in which it was written." *P & N Investments, LLC v. Frontier Mall Assocs., LP*, 395 P.3d 1101, 1105 (Wyo. 2017). The Court will "afford words in a contract the plain meaning that a reasonable person would give to them." *Id.* (citation omitted). "While unambiguous contract language is generally interpreted without resort to extrinsic evidence, it need not be interpreted in a vacuum." *Id*. at 1106, citing 11 Samuel Williston, Treatise on the Law of Contracts § 30:6 at 108 (Richard A. Lord ed., 4th ed. 2014). "We consider the language in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made." *Id*. (citation omitted). Importantly, Courts are not free to rewrite contracts under the guise of judicial construction. *Id*. at 1107.

6

DISCUSSION

A.      **Calculation of Advance Minimum Production Royalties**

First, as recognized by the Wyoming Supreme Court more than seventy years ago,

provisions for minimum royalty payments "are very common in mineral leases." *Anderson*

*v. United Coal and Coke Co.*, 227 P.2d 700, 706 (Wyo. 1951).  The Court went on to cite

with approval 58 C.J.S., Mines and Minerals, § 186(c), p. 400 as follows:

> It is usual for mining leases, especially in the coal mining regions, in
> reserving a royalty to the lessor to contain a provision of or the payment to
> the lessor of a sum variously known as a 'minimum royalty' or as a 'dead'
> or 'sleeping' rent, that is, to fix a minimum amount to be mined or a
> minimum royalty to be paid in any event within certain fixed periods, in
> which case the amount so fixed must be paid, although no mining is done or
> the royalty at the agreed rate on what is actually mined is less than the
> minimum, such royalty being considered liquidated damages and not a
> penalty.  The text is supported by numerous cases cited in 40 C.J 1029, 58
> C.J.S., Mines and Minerals, § 186. See also 36 Am.Juris. 314.  In *Allendale
> Land Co. v. Alabama By-Products Corp.*, 237 Ala. 598, 188 So. 256, 260,
> the Court stated that '**the primary purpose of minimum royalties is to
> assure the lessor a stated income from the lease**.'

*Id*. (emphasis added).  The advance royalty obligation in the Nine Mile lease is the same

sort of advance royalty discussed in *Anderson*.  *See* Section 6.C (specifically referring to it

as an advance minimum production royalty). As such, the primary purpose of this royalty

obligation is to assure the lessor a stated income from the lease.

Bridger argues that Section 6.A, and specifically the phrase which refers to

production royalties which would have been payable "to date under this Agreement,"

allows it to credit all royalties on production above the 45% minimum production

obligation during the entire term of the Nine Mile Lease against any advance royalties

which may become due should Bridger fail to meet the minimum production requirement

7

in Section 5 during some five-year period. In contrast, Wildcat argues that Section 6.A can only be interpreted to require that production royalties and advance royalties be calculated based on each five-year period without consideration of any amount of production royalties paid in prior periods. For the following reasons, the Court concludes the unambiguous language of Section 6.A supports Bridger's interpretation with somewhat of a different focus.

As referenced above, the language states:

> A. On January 1, 1991, and on **each fifth anniversary date** through the term of this Lease, Lessee shall pay to Lessor advance royalties, if any, equal to (i) the amount of Production Royalties computed according to Paragraph B of this Section 6 **which would have been payable to Lessor to date under this Agreement** had Lessor received Production Royalties on forty-five percent (45%) of all coal mined by Lessor from Rock Springs Lands and Adjoining Lands **during such period**, **less** (ii) the Production Royalties and advance royalties **actually paid** to Lessor by Lessee during **such period**. Such advance royalty payments shall be Lessor's sole remedy for Lessee's failure to comply with the provisions of Section 5.

ECF 44-3, § 6 (emphasis added).

First, the above-referenced language clearly references "Production Royalties." However, in their briefing, the parties tend to discuss "production."[4] With that said, though, the Court generally agrees with Bridger. The reference in the first line to "each fifth anniversary date through the term of this Lease" is a payment date for Bridger to pay

---

[4] As an example, Wildcat references Bridger alleging "it has accumulated a 10.5 million-ton "excess production credit" that it can unilaterally apply to wipe out any production shortfall – including its shortfall during the period from 2016 through 2020, and any additional production shortfalls in any *future* five-year period to come." ECF 44, p. 3 (emphasis in original). Similarly, Bridger discusses "deficit tonnage" and "actual tons mined." ECF 46, p. 22. Importantly, Section 6.A specifically discusses Production Royalties actually paid to date under the Nine Mile Lease, which are to be subtracted from Production Royalties which would have been payable based on the forty-five percent (45%) minimum production obligation. Consequently, the focus is on **royalties** which may be credited, not production credit.

Lessor advance royalties if any is due under Section 6.A.  It does not specify the period which governs the actual calculation of whether advance royalties are due.

The next subsection discusses the period which governs the calculation.  More specifically, subsection "(i)" specifies the first calculation: "the amount of Production Royalties computed … **which would have been payable to Lessor to date under this Agreement** had Lessor received Production Royalties on forty-five percent (45%) of all coal mined by Lessor from Rock Springs Lands and Adjoining Lands during such period…". *Id.*  This clearly and unambiguously requires Bridger to compute a hypothetical based on what would have been payable under the forty-five percent (45%) minimum production obligation over each five-year period to the current date over the full term of the Lease Agreement (i.e., from January 1, 1986 to the current date, in five-year calculations).  Contrary to Wildcat's argument, the general phrase "during such period" yields to the specific provision "payable … to date under this Agreement" which is contained in the same sub-provision "(i)," not to the phrase "each fifth anniversary date through the term of this Lease," which is the date payment is to be made. *Scherer, II v. Laramie Regional Airport Bd*., 236 P.3d 996, 1003 (Wyo. 2010) (referencing "the well-known rule that general provisions in a contract yield to specific provisions").

The next computation requires summing up what was actually paid to date (in production royalties and advance royalties).  Finally, the second "actually paid" sum is subtracted from the first "hypothetical-payable" sum based on "the forty-five percent (45%) minimum production obligation" to determine whether any advance royalties are due.  The Court concludes there is no other way to interpret "payable … to date under this

Agreement" without reading this language completely out of the Nine Mile Lease, which the Court cannot do. *See Whitney Holding Corp. v. Terry*, 270 P.3d 662, 667 (Wyo. 2012) (the court "must give effect to each word if possible, and [] strive to avoid construing a contract so as to render one of its provisions meaningless, because each provision is presumed to have a purpose") (internal quotation marks and citations omitted). Further, had the parties intended that the royalty computations be based on what was payable and actually paid over each distinct five-year period of the term of the Lease, they could have and would have used this language (as they did in Section 5).

An example might be helpful to best understand the Court's conclusion on the Section 6.A computation requirement. Assume as an example that, for the first three five-year computation periods, the sum which "would have been payable" based on the 45% minimum production obligation is $100 in production royalties. Assume further that, in the first five-year period, the lessee exceeded the 45% production obligation and actually paid $200 in production royalties. Finally assume that in the subsequent two five-year periods, the lessee failed to satisfy the 45% production obligation and only actually paid $50 for each period. The calculation is:

*January 1, 1991*
Section 6.A(i) computation (what would have been payable to date under the first 5-year, 45% production minimum) = $100
*Less*
Section 6.A(ii) computation (production royalties actually paid) = $200
*Equals negative $100*
**No advance royalties due**

10

<u>January 1, 1996</u>
Section 6.A.(i) computation = $200 ($100 for each of the two 5-year minimum
production periods)
*Less*
Section 6.A(ii) computation = $250 ($200 paid in the first period and  $50 paid in the
second five-year period)
*Equals negative $50*
**No advance royalties due**


<u>January 1, 2001</u>

Section 6.A.(i) computation = $300 ($100 for each of the three 5-year minimum
production periods)
*Less*
Section 6.A(ii) computation = $300 ($200 paid in the first period and  $50 paid each
second and third five-year periods)
*Equals zero*
**No advance royalties due**

Wildcat argues that this interpretation defeats the purpose of the advance royalty

provision and advances an expert opinion to this effect. ECF 44-1.  In determining the

intent of the parties for an unambiguous coal lease, the Court need not and should not rely

on an expert declaration when the Wyoming Supreme Court has clearly addressed the

purpose of minimum royalties. *Anderson*, 227 P.2d at 706 (assuring the lessor a stated

income from the lease); *see also Amoco Production Company v. EM Nominee Partnership

Company*, 2 P.3d 534, 539-40 (Wyo. 2000) ("When the provisions in the contract are clear

and unambiguous, the court looks only to the 'four corners' of the document in arriving at

the intent of the parties.  In the absence of any ambiguity, the contract will be enforced

according to its terms because no construction is appropriate.") (citations omitted).

Under the Court's interpretation of Section 6.A of the Nine Mile Lease, the lessor

has been assured a stated income from the lease, in the form of production royalties or

advance royalties if the calculation results in an advance royalty amount payable.  The fact that Bridger's coal production history may result in production royalties actually paid to the lessor above the minimum during certain five-year periods, reducing the amount of advance royalties payable during another future five-year period – even reducing them to zero – does not change the lessor's assurance of a stated income (<u>not</u> a "steady" income) from the lease, and it is not contrary to the primary purpose of a minimum royalty provision.

Wildcat also argues that this outcome makes the 45% minimum production obligation a ceiling or a limit, rather than a minimum.  This argument is unpersuasive.  The obligation is what it is – a minimum for purposes of both Section 5 and the first computation in Section 6.A.  If that minimum is not met, advance royalties <u>may be</u> due.  However, nothing in the lease requires advance royalties to be due and payable for any and every five-year period that the minimum production obligation is not satisfied.  If that were the case, the parties would have said so.

Wildcat further argues that this makes no sense because there would be no reason for the parties to specify a five-year period for measuring the minimum production obligation if Bridger's obligation to pay advance royalties covered the entire life of the lease.  Again, the minimum production obligation is the same in both Section 5 and Section 6.A(i) – where it is used to compute the production royalties that would have been payable to date under the Agreement.  This is the calculation unambiguously specified by the parties to the Nine Mile Lease.  Because the calculation does not provide the outcome Wildcat

desires doesn't mean the calculation of the minimum production obligation in Section

6.A(i) is either a pointless exercise or robbed of any meaning.

Additionally, Wildcat argues that Bridger's interpretation is definitively refuted by

Section 6.C.  The relevant provision reads:

> C. Payment of Production Royalties … shall be made by check within 14
> days after the end of each calendar quarter.  Payments may be reduced by
> advance royalty payments accrued pursuant to Paragraph A to the extent
> Production Royalties payable in any year exceed the amount which would
> have been payable to Lessor had forty-five percent (45%) of production that
> year been taken from Rock Springs Lands.

ECF 44-3, ¶6.C.

Wildcat argues this subsection shows the parties contemplated what should happen

if the lessor exceeds the minimum production obligation, and it is not the outcome

advanced by Bridger.  The Court again disagrees with Wildcat.  Section 6.C doesn't discuss

reducing advance royalties by excess production royalties, which is the issue here, but

rather it affords the lessee the ability to reduce production royalties due at the end of a

production quarter by advance royalties accrued. No advance royalties have accrued so this

provision is not on point, nor does it clarify the parties' intent beyond what it specifically

addresses. Section 6.C only addresses the scenario that, if advance royalties have accrued

and gone unpaid, this provision is available to the lessee to reduce or eliminate the accrual.

Section 6.C and the Court's interpretation of Section 6.A can and do co-exist without

contradiction.

Finally, Wildcat argues Bridger's interpretation is contradicted by its own conduct

during the events leading up to this lawsuit by Bridger's initial payment to Wildcat of

advance royalties.  This argument is unpersuasive.  The conduct of Bridger's employees, apparently faced with a new circumstance, cannot change the meaning of the Nine Mile Lease.  Additionally, a payment made under a mistaken belief that payment is required can be recovered.  *See Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 485 (10th Cir. 2023).  The plain and unambiguous language of Section 6.A prevails over the conduct of any employee of either party.

Therefore, the Court generally agrees with Bridger that Section 6.A envisions two calculations, each consistent with computing royalties (payable and actually paid) over the course of five-year production periods to the current date under the full term of the Agreement.

## B.  **"Adjoining Lands"**

The parties also dispute what constitutes "Adjoining Lands" for purposes of computing the minimum production obligation and advance royalties.  Wildcat argues that all adjoining leases are to be included, which means that production from any contiguous leases or permits and the land covered thereby are Adjoining Lands.  According to Wildcat, this means that Section 11, Section 25, and the Ten Mile Lease are Adjoining Lands. Wildcat also argues that other leases[5] from the Federal and State government are

---

[5] These are the additional Federal and State leases which Wildcat contends are Adjoining Lands: (a) BLM lease at Township 22 North, Range 101 West, Section 26; (b) BLM lease at Township 22 North, Range 101 West, Section 34; (c) BLM lease at Township 21 North, Range 101 West, Section 2; (d) BLM lease at Township 21 North, Range 100 West, Section 6; (e) BLM Lease at Township 21 North, Range 101 West, Section 12; (f) State of Wyoming lease at Township 22 North, Range 101 West, Section 36; and (g) State of Wyoming lease at Township 20 North Range 100 West, Section 36. Bridger does not contest that the State of Wyoming lease at Township 20 North, Range 100 West, Section 36 is part of the Adjoining Lands under the Nine Mile Lease. ECF 46, p. 19, fn 4.

"Adjoining Lands" because they are either encompassed by the Ten Mile Lease or are covered by a contiguous lease or permit as the Nine Mile Lease.

Bridger disagrees and argues that "Adjoining Lands" is limited to contiguous Federal and State surface mining leases only. According to Bridger, Section 11 and Section 25 leases are private leases, and the Ten Mile Lease governs underground mining, so none of these leases are included as Adjoining Lands. Bridger also argues that the other State and Federal leases not encompassed by the Ten Mile Lease (Sections 26, 34, and 36 of Township 22 North, Range 101 West) are not contiguous to Rock Springs Lands and thus cannot be Adjoining Lands.

As noted above, the lease language at issue essentially defines "Adjoining Lands" as those coal leases and coal prospecting permits from the United State and the State of Wyoming which are listed on Exhibit "A" of the Nine Mile Lease, "and any contiguous leases or permits acquired hereafter" which "are contiguous" to Rock Springs Lands. The Court concludes that this lease language is unambiguous.

1.   *Section 11 and Section 25 Leases ("Private Leases") and the Ten Mile Lease*

In interpreting this unambiguous definition of "Adjoining Lands," the parties both acknowledge that the purpose of defining "Adjoining Lands" is to require Bridger to produce "approximately not less than" 45% of the total coal production from Rock Springs Lands and Adjoining Lands, and thereby ensure that Bridger did not avoid the Rock Springs Lands and thereby avoid paying royalties to the Lessor. ECF 46, p. 14. The Court further concludes that the use of the term "any" without a modifier must be given the common and ordinary understanding which is "all or every." *Garton v. State*, 910 P.2d

15

1348, 1353 (Wyo. 1996) ("[w]ith regard to the plain meaning of the word 'any' we have said, '[t]he common and ordinary understanding of the word is that it means all or every' and '[n]ecessarily it gives to the language employed a broad and comprehensive grasp.'") (cleaned up; citation omitted).  The Nine Mile Lease clearly shows that the parties knew how to specifically identify leases as United States leases and State of Wyoming leases. ECF 44-3, ¶ 3 & Exhibit "A".  Had they wished to limit the word "any" so that it would not carry the "all or every" common understanding, they would have.

Further, Bridger's arguments which rely on affidavits concerning what it and Anadarko considered to be "Adjoining Lands" are unpersuasive.  *See* ECF 48 ¶¶ 25 & 29; 49 ¶ 19; 51 ¶¶8 & 12-13.  These affidavits constitute impermissible extrinsic evidence and shed no light on the surrounding circumstances, the subject matter, or the purpose of the Nine Mile Lease to interpret the unambiguous language of "Adjacent Lands" consistent with the parties' intent. *See P&N Investments LLC v. Frontier Mall Assocs.*, 395 P.3d 1101, 1105 (Wyo. 2017).  Additionally, even if the language were ambiguous, which the Court concludes it is not, the Court cannot rely on "the parties' own extrinsic expressions of intent because the court takes an objective approach in interpreting contracts." *North Silo Resources, LLC v. Deselms*, 518 P.3d 1074, 1082 (Wyo. 2022) quoting *Ultra Res., Inc. v. Hartman*, 226 P.3d 889, 905 (Wyo. 2010) (other citations omitted).

Bridger also argues that, at the time the Nine Mile Lease was executed, RSRC and later Anadarko owned all the private land in the Nine Mile Draw area.  Given this context, Bridger argues there was no need for other private lands to be in the definition of Adjoining Lands because Anadarko could set the terms of any other private leases at the Bridger Mine

and would obtain separate royalties from those leases. This context argument is unpersuasive in changing the Court's understanding of "any" contiguous leases or permits. The minimum production obligation of the Nine Mile Lease was to assure production from the Rock Springs Lands, not other, separately leased private lands. The fact that the same lessor receives production royalties from a contiguous private lease and may also receive an amount of advance royalties under the Nine Mile Lease is neither a surprising outcome nor a windfall. Finally, Bridger points to nothing specific or helpful in the lease terms covering the other private lands to persuade the Court that those terms were intended to modify the unambiguous language of the Nine Mile Lease so as to take production under the contiguous private leases out of the Nine Mile Lease's definition of Adjoining Lands.

Further, Bridger argues that the original Nine Mile Lease, which only allowed surface mining of coal, shows the parties understood 1) that Bridger would only use surface mining methods in the Nine Mile Lease area, and 2) that Adjoining Lands only included contiguous federal and state lands upon which Bridger mined coal by surface mining methods. This argument is also unpersuasive. Again, the unambiguous phrase "and any contiguous leases or permits acquired hereafter" contains absolutely no reference to coal mining methods and the Court will not read one in.

Additionally, Bridger argues that Section 15 clearly states that "all" of the leases on Adjoining Lands can be surrendered to either the United States Government or the State of Wyoming and makes no provision for leases on adjoining private lands. Therefore, according to Bridger, once the Court considers the Nine Mile Lease as a whole, this will show the parties intended the definition of Adjacent Lands to not include private leases.

17

Also, Bridger points to Section 15 which requires Bridger to give notice to the lessor if Bridger intends to assign any of the leases on Adjoining Lands, at which time the lessor has the option to accept the assignment in its name.  According to Bridger, this clause is entirely unnecessary if Adjoining Lands included other lands owned by Anadarko or its successor-in-interest because it would not need to lease its own land from itself.  ECF 44-3, ¶ 15.

  This argument also is unpersuasive.  As to the first argument, the phrase in the first paragraph of Section 15 reads, "[i]n the event Lessee shall at any time desire to surrender all or any of the leases on Adjoining Lands to the United States Government or the State of Wyoming…"  This phase is a preposition which simply means if or when something happens.  The phase does not define or limit the definition of Adjoining Lands.  It simply means that, <u>if</u> Bridger desires to surrender these specific leases to these specific entities, <u>then</u> Bridger must give notice to the Lessor so that the Lessor may consider whether to exercise any right it may have to require Bridger to assign these leases to the Lessor or to some other entity it designates.  As to the second argument (concerning the second paragraph of Section 15), the paragraph is not "entirely unnecessary" as argued by Bridger because it affords the Lessor both notice and the right to elect a different assignee or sublessee if the Lessor owns the lands under the private lease.

  Bridger also argues that Anadarko never questioned Bridger's royalty calculation during audits – which it would have if Bridger had failed to include the significant

production volume from the Ten Mile Lease governing underground mining.[6]  Bridger advances the proposition that this shows a course of dealings between and conduct of the parties in support of its argument that contiguous leases governing underground mining should not be included as Adjoining Lands.  The Court rejects this argument because it ignores the fact that Anadarko was a successor-in-interest to RSRC, and it was not the original lessor/party to the Agreement.  In addition, the argument ignores the fact that all Anadarko did was accept payment, and there is nothing in the record showing that Anadarko agreed with Bridger's understanding of what was to be included as Adjoining Lands.  Finally, this argument would be unpersuasive because Anadarko cannot waive full performance under the Nine Mile Lease.  ECF 44-3, § 17.[7]  In short, Anadarko's only conduct in accepting payment does not change the terms of the Nine Mile Lease, nor limit Wildcat's right to demand full performance under the lease.

Finally, Bridger argues that this interpretation would make it practically impossible for it to perform under the Nine Mile Lease.  In support of this argument, Bridger points to Section 5 which specifies that the minimum production requirement must be satisfied "consistent with good engineering practices." According to Bridger, good engineering practices in the context of checkerboard state and federal leases require that it conduct its mining operation so as to achieve maximum economic recovery of the recoverable coal

---

[6] Bridger points out that, if the Ten Mile Lease area was considered Adjoining Lands, then there would have been a production shortfall beginning in the five-year period from 2006 to 2010.

[7] This section states, "The waiver by either party of any breach of any term, covenant or condition hereof shall not be deemed to be a waiver of such term, covenant, or condition or of any subsequent breach of the same or of any other term, covenant or condition herein contained. … **The acceptance of payment after the same has become due shall not be construed as a waiver of any other than the existing default or failure to perform under this lease.**" ECF 44-3, § 17 (emphasis added).

reserves and prevent waste.  Consequently, Bridger cannot avoid mining federal or state lands simply to meet its production obligation under the Nine Mile Lease.

Bridger's argument about "good engineering practices" completely ignores the fact that it has been mining the Nine Mile Draw area for nearly forty years, apparently consistent with good engineering practices.  Thus, the facts belie Bridger's argument that the Nine Mile Lease somehow requires it to avoid mining any area.  Further, Bridger is not required to avoid any leased lands under any interpretation of the Nine Mile Lease because Bridger "may determine, in its own discretion, the sequence of extracting coal from Rock Springs Lands and Adjoining Lands." ECF 44-3, § 5. Failure to take the agreed-upon quantities of coal from Rock Springs Lands simply requires Bridger to determine whether advance royalties are due and payable and pay any amounts due.

In summary, the Court concludes the two Anadarko Coal Leases referred to as the Section 11 and Section 25 Leases and the Anadarko Ten Mile Rim Coal Lease constitute Adjoining Lands for purposes of both the minimum production obligation in Section 5 and the advance royalty calculation in Section 6 of the Nine Mile Lease.

2.    *BLM and State of Wyoming Leases - Sections 26, 34, and 36 of Township 22 North, Range 101 West not Encompassed Within the Ten Mile Lease*

Bridger argues these other State and Federal Leases fall outside the definition of Adjoining Lands because they are not "contiguous to the lands of Rock Springs." ECF 44-3, ¶ 1.  Bridger provides a map depicting these sections, which shows that these sections are separated from the Rock Springs Lands by at least a half a section of land, and in the case of Section 26, multiple sections.  ECF 48-1, p. 2.  Bridger argues that contiguous is

defined as "[t]ouching at a point or along a boundary." ECF 46, p. 19, citing Black's Law Dictionary (11th ed. 2019) and *Bd. of Cnty. Comm'rs v. City of Cheyenne*, 85 P.3d 999, 1007-08 (Wyo. 2004) (collecting cases). Wildcat responds that these three sections are contiguously leased or permitted and provides a map showing Bridger's permit boundary. ECF 58-5, p. 2, 70-1.

As to the State of Wyoming lease, the Court agrees with Bridger that this lease does not constitute Adjoining Lands. This lease is not a contiguous lease or a contiguous permit. The mere fact that this lease falls within the same mine permit boundary does not make it a contiguous permit. The State of Wyoming lease is not coal prospecting permit, and there is only one permit encompassing the Rock Springs Lands and Adjoining Lands. Consequently, the State of Wyoming lease does not constitute Adjoining Lands for purposes of either the minimum production obligation in Section 5 or the advance royalty calculation in Section 6.

As to the BLM Lease, for the reasons articulated in the Order Granting Wildcat's Motion to Amend/Correct the Court's Order on Motion for Summary Judgment (ECF 74), the Court concludes that Sections 26 and 34 constitute Adjoining Lands.

CONCLUSION

Based on the foregoing, the Court GRANTS IN PART AND DENIES IN PART the motion for summary judgment filed by Wildcat Coal LLC (ECF 43), and GRANTS IN PART AND DENIES IN PART the motion for summary judgment filed by Pacific Minerals, Inc. and Idaho Energy Resources Co. doing business together as a joint venture under the trade name Bridger Coal Company (ECF 45).

More specifically, Wildcat's motion (ECF 43) is GRANTED IN PART as to Recital Paragraph 3 of the Nine Mile Lease based on the Court's conclusion that the phrase "Adjoining Lands" includes all leases contiguous to Rock Springs Lands and acquired by Bridger since the Nine Mile Lease's inception, but the phrase does not include the State of Wyoming Lease encompassing Section 36 of Township 22 North, Range 101 West because that lease is not a contiguous lease or permit. Wildcat's motion is DENIED in all remaining respects.

Further, Bridger's motion (ECF 45) is GRANTED IN PART based on the Court's conclusion that Section 6.A of the Nine Mile Lease envisions two calculations, each consistent with computing royalties (payable and actually paid) over the course of five-year production periods to the current date under the full term of the Agreement, and also based on the Court's conclusion that the phrase "Adjoining Lands" does not include the State of Wyoming Lease encompassing Section 36 of Township 22 North, Range 101 West because these are not contiguous leases or permits. Bridger's motion is DENIED in all remaining respects.

THEREFORE, IT IS HEREBY ORDERED:

1. The Motion for Summary Judgment (ECF 43) filed by Wildcat Coal LLC is **GRANTED IN PART AND DENIED IN PART**; and

2. The Motion for Summary Judgment filed by Pacific Minerals, Inc. and Idaho Energy Resources Co. doing business together as a joint venture under the trade name Bridger Coal Company (ECF 45) is **GRANTED IN PART AND DENIED IN PART**; and

3.   The Motion to Strike Declaration and Expert Report of Plaintiff's Expert Andrew E. Fox, P.E. filed by filed by Pacific Minerals, Inc. and Idaho Energy Resources Co. doing business together as a joint venture under the trade name Bridger Coal Company is **DISMISSED AS MOOT** given that the declaration and expert report was not considered by the Court for the reasons discussed herein; and

4.   Bridger shall complete the computation required by Section 6.A of the Nine Mile Lease consistent with this decision[8] and provide it to Wildcat no later than September 6, 2023; and

5.   The parties shall meet and confer and file a case management report with the Court no later than September 18, 2023, which either identifies any remaining issues for the Court's attention or, if all issues have been decided, a proposed form of judgment; and

6.   The pending Motions in Limine filed by the parties (ECF 66, 67) are **DISMISSED** with leave to refile should further proceedings be warranted.

IT IS SO ORDERED.

Dated this 29th day of August, 2023.

_Nancy D. Freudenthal_
_____
NANCY D. FREUDENTHAL
UNITED STATES SENIOR DISTRICT JUDGE

---

[8] This will require Bridger to recompute production royalties which would have been payable to the lessor over each five-year period to the current date under the entire term of the Agreement consistent with this Court's conclusion as to what constitutes "Adjoining Lands," and Bridger may not rely on its past computations even assuming those computations were agreeable to Wildcat's predecessors-in-interest.